The State of Ohio, Appellee, *v.* Rogers, Appellant.

[Cite as State *v.* Rogers (1985), 17 Ohio St. 3d 174.]

(No. 84-784—Decided June 5, 1985.)

*Anthony G. Pizza,* prosecuting attorney, *James D. Bates* and *James E. Yavorcik,* for appellee.

*John J. Callahan, Ralph DeNune III* and *Douglas A. Wilkins,* for appellant.

WILLIAM B. BROWN, J. In order to determine whether appellant's death sentence should be affirmed, this court is required to do three things. First, we must answer the specific issues raised by appellant regarding the proceedings below. Second, we must independently weigh the aggravating circumstances in this case against any factors which mitigate against imposition of the death penalty. Finally, we must independently consider whether appellant's sentence is disproportionate to the penalty imposed in similar cases.

I

Appellant first attacks the constitutionality of Ohio's framework for imposition of capital punishment by advancing arguments similar to those used by the appellants in the recently decided cases of *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, and *State* v. *Maurer* (1984), 15 Ohio St. 239. Appellant argues (1) that a statutory aggravating circumstance in a capital case must encompass a fact independent of the facts of the principal offense in order to comply with the United States and Ohio Constitutions, (2) that Ohio's capital sentencing structure, which requires the prosecution to prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, violates due process, (3) that Ohio's death penalty law fails to set forth adequate safeguards to prevent the imposition of capital punishment in an arbitrary manner, (4) that Ohio's death penalty statute allows arbitrary and capricious imposition of the death penalty because it does not articulate a method to weigh aggravating circumstances against mitigating factors, and (5) that the statutory sentencing scheme for imposition of the death penalty violates the federal and state Constitutions because it is not the least restrictive means of accomplishing the objectives of the administration of justice. This court addressed and rejected each of these arguments in *Jenkins*. We held in *Jenkins* that Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, in the context of these arguments, violates neither the United States nor the Ohio Constitutions. They can not, therefore, be the basis for reversal in this case.

Appellant raises an additional constitutional question which was not addressed in either *Jenkins* or *Maurer*. Appellant claims that Ohio's death penalty sentencing procedure places a defendant in double jeopardy by allowing re-introduction of evidence regarding aggravating circumstances at the penalty phase of the trial. As noted by the court of appeals in this case, the United States Supreme Court has previously upheld similar statutory schemes providing for bifurcated trials in capital cases. See *Proffitt* v. *Florida* (1976), 428 U.S. 242, and *Gregg* v. *Georgia* (1976), 428 U.S. 153. The two phases of a capital trial are just that, two segments of one trial. Appellant was not placed in jeopardy for a second time during the sentencing phase of his trial, but, rather, remained in jeopardy for a final disposition of his case. Accordingly, this argument must be rejected.

Appellant raises several issues citing trial court error which we addressed in *Jenkins*. Appellant argues that the trial court erred first by advising the jury at the penalty phase of the trial that its decision to recommend the death penalty was not binding, and, second, by instructing the jury to disregard sympathy in its consideration of the evidence. Appellant contends further that the trial court was required to instruct the jury at the penalty phase of the trial that a non-unanimous verdict was sufficient to impose a sentence of life imprisonment. We addressed these conten-

tions in *Jenkins* and found them to be without merit. Accordingly, they will not be the basis for reversal in this case.

Appellant also contends that due process requires separate trials on the issues of insanity and guilt. There is no authority in Ohio for bifurcation of a trial upon a plea of insanity. Various federal courts have ruled on the issue and have found that due process does not require a separate trial on the issue of insanity, and that the states are free to determine whether such issues should be tried separately or together. *E.g., Vardas* v. *Estelle* (C.A.5, 1983), 715 F. 2d 206, 212-213; *Murphy* v. *Florida* (C.A.5, 1974), 495 F. 2d 553, 557, affirmed (1975), 421 U.S. 794. Federal courts have further held that the question of bifurcation rests solely within the discretion of the trial court and that appellant must show an abuse of discretion for reversal. *Higgins* v. *United States* (C.A.D.C. 1968), 401 F. 2d 396, 398. Adopting this standard we find that appellant has failed to show an abuse of discretion in this case. He has merely claimed that:

"* * * Prejudice certainly resulted in this proceeding when Rogers was forced to claim that he was not guilty and simultaneously to admit that he committed the offense but that there were circumstances exonerating him from responsibility for his conduct."

To the contrary, we feel that the pleas of not guilty by reason of insanity and not guilty are not necessarily contradictory. Where the accused is so insane at the time of the act that he is unable to form the requisite guilty purpose, he can not be found guilty. Since it is not necessarily prejudicial to require appellant to present evidence for both pleas in a single trial, the trial court's failure to bifurcate was not an abuse of discretion. As a result, we find no error in the trial court's decision to try both issues in a single trial.

Appellant's next propositions concern the death qualification process used during jury selection. He first contends that he was denied his right to a fair trial by an impartial jury when the jury was death-qualified with general questions about the prospective jurors' opinions on the death penalty. He then argues that even if general questions are permitted, it was error for the trial court to allow questioning of prospective jurors regarding the imposition of the death penalty in this particular case.

In *Jenkins, supra,* we analyzed appellant's first contention under the rationale of *Witherspoon* v. *Illinois* (1968), 391 U.S. 510 [46 O.O.2d 368]. We found at 179 that according to *Witherspoon,* veniremen could be excluded for cause if they " 'made [it] unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*' (Emphasis *sic.*)" Since our decision in *Jenkins,* the United States Supreme Court has modified the *Witherspoon* standard in *Wainwright* v. *Witt* (1985), ____ U.S. ____, 83 L. Ed. 2d 841. The Supreme Court dispensed

with the reference to "automatic" decision-making and the "unmistakable clarity" standards. The *Witt* court held that the proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. See *Adams* v. *Texas* (1980), 448 U.S. 38, 45. Accordingly, we reaffirm our decision in *Jenkins* in light of *Witt,* and hold that a jury may be death-qualified with general questions concerning the prospective jurors' opinions on capital punishment.

In *Jenkins* we did not specifically address the issue of whether a question to prospective jurors phrased in terms of "this" case is improper. The *Jenkins* opinion did, however, set forth the manner in which the jurors in that case were questioned on *voir dire*. We found the following questions allowable:

"* * * [A]re you stating to me unequivocally that under those circumstances will you follow my instructions as Judge and that you cannot and will not consider fairly the imposition of the sentence of death if appropriate, *in this case*?" (Emphasis added.) *Id.* at 185.

"* * * [A]re you stating to me unequivocally that under no circumstances will you follow my instructions as Judge, and that you cannot and will not consider fairly and [*sic*] imposition of the sentence of death, if appropriate, *in this case*?" (Emphasis added.) *Id.* at 183.

In the instant case the judge questioned each potential juror in similar fashion:

"* * * In the event that you are selected as a juror in this case, and in the event that a finding of guilt is made, one of the penalties you may be asked to consider is the death penalty. As you sit here now are there any circumstances that you can foresee that will preclude you from following the Court's instructions and fairly considering the imposition of the death penalty *in this case*?" (Emphasis added.)

A negative response to that question would not indicate that the juror was predisposed to voting for the death penalty given the facts of *this* case. He had not yet been presented with any evidence regarding the facts of this case. Such a response would merely indicate that, in *this* case, the only case in which he is being considered as a juror, he would be able to follow the court's instructions and fairly consider the death penalty as required by law. Appellant's argument must, therefore, be rejected.

Appellant further contends the trial court denied him a fair trial by overruling his challenges of potential jurors for cause. Appellant argues that three prospective jurors had preconceived biases toward either the death penalty or appellant's plea of not guilty by reason of insanity. Appellant claims the trial court denied him due process when it overruled his challenges for cause and forced him to use his peremptory challenges prematurely. To determine whether the jurors challenged by appellant for cause should properly have been excluded, we apply the previously men-

tioned *Witt* standard of whether the prospective juror's views would prevent or substantially impair the performance of his duties according to his instructions and oath. Additionally, *voir dire* may constitute reversible error only upon a showing of abuse of discretion by the trial court. Upon thorough review of the *voir dire* transcript, we find that the trial court's denials of appellant's challenges for cause are supported by the record, therefore, appellant's argument for reversal on this issue has no merit.[1]

---

[1] The first prospective juror appellant challenged for cause, Charles L. Spitler, was questioned as follows after he indicated that he did believe in the death penalty:

"MR. SPITLER:   When I answered that question, I don't know the case, I don't the circumstances, I don't know how it was done or anything like that, so how could I really judge the death penalty?

"* * *

"THE COURT:   In the event you are given all of these considerations under the proper instruction by the Court —

"MR. SPITLER:   Uh-huh.

"THE COURT:   — and in the event the evidence does indeed allow you to consider mitigating circumstances, the question is, will you, in consultation with other members of the jury and in your own mind, take into account all of the evidence that is presented, take into account all of the possible sentences that the evidence says you may take into account and that the law says that you may take into account, and once all of that is presented to you, only then make a decision that you, together with your fellow jurors, believe is appropriate under the circumstances that exist then at that time in the case? Will you do that?

"MR. SPITLER:   Yes.

"THE COURT:   All right. Is the challenge renewed?

"MR. CALLAHAN [counsel for defendant]:   Reserved."

Spitler's responses to the court's questions indicate that he was not irrevocably committed to a verdict before trial and that his performance of his duties as a juror would not be substantially impaired by his views on the death penalty. He was not, therefore, subject to a challenge for cause.

The second prospective juror appellant challenged for cause, Arthur F. Meissner, was questioned as follows:

"MR. BATES [assistant prosecutor]:   Okay. Now, the purpose of this interrogation is to determine whether you have any preconceived, personal or religious beliefs that would preclude you from considering all of the alternative penalties involved in the case when we get to that stage. Is there anything that you can think of in your background that would preclude you from considering the death penalty or considering life imprisonment based on the facts that you hear during the course of the trial?

"MR. MEISSNER:   No.

"MR. BATES:   Okay. Nothing further.

"MR. MEISSNER:   As I stated before, yes, I believe in the death penalty, should it be proven that the Defendant is guilty beyond any shadow of a doubt. It's got to be embedded in my mind that the Defendant is either guilty or not guilty.

"MR. BATES:   All right. Okay. Nothing further.

"THE COURT:   Based upon that expansion, I'd like to just simply clarify that you will be asked to consider, in the event of a finding of guilt —

"MR. MEISSNER:   Uh-huh.

"THE COURT:   And it isn't beyond a shadow of a doubt, just beyond a reasonable doubt. You will be asked to consider three possible sentences which include the death penalty—

"MR. MEISSNER:   Right.

Appellant next maintains that evidence of his conviction for both kidnapping and rape, submitted by the state during the penalty phase of the trial, constituted unnecessary duplication of aggravating circumstances. Appellant argues that two separate aggravating circumstances cannot arise from the exact same conduct and animus. Appellant claims that this case does not involve two separate incidents, one a rape and one a kidnapping. Rather, he argues that the same behavior and intent the jury found to constitute rape were also the basis for its finding of kidnapping.

This same argument was put forth in *Jenkins* and this court found that the aggravating circumstances of aggravated robbery and kidnapping must be merged. *Jenkins* at 197-198 cited the rationale of *State* v. *Logan* (1979), 60 Ohio St. 2d 126 [14 O.O.3d 373], as follows:

" '(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the *restraint is prolonged,* the *confinement is secretive,* or the *movement is substantial* so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

---

"THE COURT: — as well as two options on the life sentence.

"Now, all that anybody is concerned about, and you've answered the question, really, on the death penalty question, would you also fairly consider all of the evidence with respect to whether or not the life sentence would appropriately be imposed? We want you to give — be sure you'll give fair consideration to all of those.

"MR. MEISSNER: Yes, I believe I would."

The court's questioning continued:

"THE COURT: The Court is going to take the liberty of inquiring further and only in a very limited respect.

"Would you Mr. Meissner, listen to — I want to make an assumption now, a finding of guilt has been made and we are in the second phase of the trial, the second phase of the trial being, for lack of a better term, the penalty phase where the jury recommends what sentence will be — which they would recommend be imposed. Will you, sir, listen to all of the evidence that will be presented in that hearing, take into account the instructions of law by the Court, which will include instructions regarding the various alternatives in sentencing, consult with your fellow jurors, based upon the collective wisdom of the jury impose that — or recommend that sentence which you collectively believed appropriate, taking into account all the evidence and all of the law?

"MR. MEISSNER: I could do that."

While this dialogue does indicate that Meissner had an opinion about the death penalty, it does not suggest that he would be unable to correctly apply the law to a case. Thus, he also was not subject to a challenge for cause.

The final person challenged by appellant for cause, Peter P. Uhler, was questioned as follows:

"THE COURT: Very well. The death penalty, under certain circumstances, may be imposed in Ohio. Additionally you would be asked to consider the possibility of the imposition of life imprisonment.

"Would you listen to the evidence and the law as it relates to both of those possible sentences and consider each of them fairly under the evidence and law that will be given to you?

" '(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions. [Emphasis added.]'

"As the *Logan* court recognized, the critical consideration 'is whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense.' *Id.* at 135. Cf. *State* v. *Price* (1979), 60 Ohio St. 2d 136, at 143 [14 O.O.3d 379]."

In *Jenkins* the restraint of movement involved in holding a robbery victim at gunpoint was found to be incidental to the actual robbery. In the instant case, however, it is not so clear that the restraint of movement necessary for appellant to rape Lisa Bates was the only restraint of movement considered by the jury. Appellant somehow had to get Lisa inside his apartment before he raped and killed her. Applying the *Logan* guidelines, it is unclear how prolonged the restraint was in this case, although Lisa was inside appellant's apartment from 3:45 p.m. until the police found her body at approximately 11:55 p.m. Also, unlike the alleged kidnapping in *Jenkins* where the restraint took place in a public bank, appellant's restraint of Lisa was secretive, as it took place inside his apartment. Additionally, appellant's restraint of Lisa involved substantial movement. He evidently moved her up an outside stairway, into his apartment and then to his bedroom. Thus, this is not a case where the kidnapping is merely in-

---

"MR. UHLER: Yes."

The questioning continued:

"MR. YAVORCIK: Okay. And if someone is guilty you could fairly consider an appropriate punishment, whatever?

"MR. UHLER: Whatever.

"MR. YAVORCIK: You could look at all the options presented to you and make a decision fairly?

"MR. UHLER: Right.

"MR. YAVORCIK: Choosing one of those options?

"MR. UHLER: Right."

The court asked some additional questions:

"THE COURT: In the event you were called upon to consider the punishment in this case and, as you have basically been advised by the Court and both counsel, assuming a conviction that required full consideration of all possible penalties, you would be advised that you could consider the death penalty and life imprisonment. The most important consideration that we need to know from you now is would you give equal and fair consideration to both and to all of the circumstances that you must consider before making a decision as to what you would recommend to the Court?

"MR. UHLER: I don't know what you mean by that.

"THE COURT: I basically mean will you follow the law and not have any preconceived judgment about what would be most appropriate in this case?

"MR. UHLER: Yes. Right. I'd follow the law because as a citizen we're supposed to obey the laws of the nation, the government and so forth."

By his answers, Uhler also indicated that he would follow his instructions and oath when determining appellant's guilt or innocence, and when recommending a sentence. The trial court, therefore, properly ruled that he was not subject to a challenge for cause.

cidental to the rape. Such a case would be found where the only restraint involved was the holding of the victim in place while a defendant raped her. Accordingly, the specifications of kidnapping and rape are and were properly considered separately as aggravating circumstances.

Appellant also asserts that the trial court was required to instruct the jury as to the defendant's disposition were he found not guilty by reason of insanity. Appellant requested that the jury be instructed in part as follows:

"* * * If, however, the Court finds by clear and convincing evidence that the defendant is a mentally ill person subject to hospitalization or a mentally retarded person subject to institutionalization, this Court is required by law to commit the defendant to a hospital for treatment of mental illness or to an institution for care and treatment for mental retardation."

Appellant contends that this instruction was necessary because of the publicity given John Hinckley's release after being found not guilty by reason of insanity of shooting President Reagan. The court of appeals properly noted, first, that the requested instruction was an incomplete statement of the law as contained in R.C. 2945.40 and, second, that the subject of disposition is a matter for the court and not for the jury and, thus, need not be considered by the jury. For these reasons, the trial judge did not abuse his discretion by refusing to give appellant's requested instruction.

Appellant next urges that the trial court was required to explain to the jury the difference between the insanity defense and the defendant's mental state as a mitigating factor. Appellant concedes that the trial court correctly instructed the jury on the insanity defense at the conclusion of the guilt phase of the trial, and correctly instructed the jury as to defendant's mental condition as a mitigating factor at the conclusion of the sentencing phase of the trial. He argues, however, that the judge failed to point out that the two standards are not identical, and to explain in detail the differences.

The trial court is required to give a full and correct statement of the law so that the jury can apply that law to the facts in evidence before it. In a capital case, the judge may not, by his statement of the law, restrict the mitigating factors the jury may consider. *Lockett* v. *Ohio* (1978), 438 U.S. 586 [9 O.O.3d 26]. Appellant did not advise the court as to how the mitigating factor of his mental state should be explained. Any attempt to define or explain may have been viewed as an attempt to restrict that factor, and would have been improper. Accordingly, the trial court's instructions regarding mitigating factors were complete and correct, and appellant's argument has no merit.

Appellant next claims he has the right to open and close arguments during the sentencing phase of the trial. Appellant argues that since he has the burden of going forward with evidence of mitigation, he has the right to opening and closing arguments pursuant to R.C. 2315.01(F).

While appellant correctly recognizes his burden of going forward at the sentencing phase of a capital trial, the burden of persuasion remains on the state. The state must prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors before the jury can recommend the death sentence. See R.C. 2929.03(D). Thus, pursuant to R.C. 2945.10(F), which sets forth the order of proceeding in a criminal case, the state has the right to open and close arguments to the jury.

Appellant contends further that the word "age," as used in R.C. 2929.02(A), 2929.023, 2929.03 and 2929.04, refers to his mental age, rather than his chronological age. Appellant argues that although chronologically he was forty-two years old at the time of the offense, his mental age was somewhere between ten and twelve years and, therefore, it was improper for the trial court to sentence him to death. It is settled law that when interpreting statutes, words should be given their plain meaning. Absent any indication to the contrary, the word "age" means chronological age and should be interpreted as such in this case. That is not to say that appellant's mental age is not a factor to be considered when determining the appropriateness of the death penalty. To the contrary, R.C. 2929.04(B)(3) explicitly requires that defendant's mental capacity be weighed as a mitigating factor against imposition of the death penalty. Rather than twisting the meaning of the word "age" in order to preclude sentencing appellant to death, this court will consider appellant's very low mental age as an extremely weighty factor mitigating against the death penalty.

Appellant next proposes that the trial court had the authority to order the disclosure of the grand jury transcripts of cases sought by him, after he had filed a notice of appeal to the court of appeals. Appellant first argues that procedurally the trial court retained jurisdiction to order disclosure of the grand jury transcripts because this action would not be inconsistent with his appeal. Appellant relies on *State, ex rel. Special Prosecutors,* v. *Judges* (1978), 55 Ohio St. 2d 94 [9 O.O.3d 88], in which this court at 97 acknowledged that, although the general rule is that the trial court loses jurisdiction to take action in a cause after an appeal has been filed, it "does retain jurisdiction over issues not inconsistent with that of the appellate court to review, affirm, modify or reverse the appealed judgment * * *." Appellant claims further that the grand jury transcripts are discoverable in this case because his particularized need for them outweighs the general policy that grand jury transcripts are to be kept secret. See Crim. R. 6(E) and *State* v. *Laskey* (1970), 21 Ohio St. 2d 187 [50 O.O.2d 432]. Appellant contends that the cases for which he requested transcripts are factually similar to his case, and should have been considered in the court of appeals' proportionality review.

Contrary to appellant's contentions the proper court to determine whether the requested grand jury transcripts would be helpful in deciding this case was the court of appeals. The trial court's only remaining

jurisdiction over the case after appellant filed his notice of appeal allowed it to take action in aid of the appeal. See *Majnaric* v. *Majnaric* (1975), 46 Ohio App. 2d 157 [75 O.O.2d 250]. Thus, appellant petitioned the wrong court for disclosure.

Assuming, *arguendo,* that the trial court did have jurisdiction to allow disclosure of the grand jury transcripts, it could not properly have done so. Crim. R. 6(E) delineates the degree of secrecy accorded grand jury proceedings. This court in *Laskey* at 191 stated that secrecy must be maintained unless the defense demonstrates that a particularized need for the transcripts outweighs the need for secrecy. In the instant case appellant claims that the cases requested were factually similar to his case, and that the court could not determine whether the death penalty was proportionate for his case without considering the facts of these other cases. The flaw in this logic is that the records requested were *grand jury* transcripts. Such transcripts present only the prosecutor's evidence for the purpose of determining whether a suspect should be indicted. They do not show even whether the accused was guilty, much less identify his penalty. The grand jury transcripts, therefore, could not have aided in the court's proportionality review. Accordingly, there was no particularized need for disclosure in this case, and appellant's argument has no merit.

Appellant further contends the trial court violated his right to a fair trial by permitting the media to televise, photograph and broadcast his trial. Appellant argues that C.P. Sup. R. 11 and Canon 3(A)(7) of the Code of Judicial Conduct violate due process. C.P. Sup. R. 11 provides in pertinent part:

"The judge presiding at the trial or hearing shall permit the broadcasting or recording by electronic means and the taking of photographs in court proceedings open to the public as provided in 3(A)(7) of the Code of Judicial Conduct. * * *"

Canon 3(A)(7) of the Code of Judicial Conduct provides:

"A trial judge or appellate court should permit:

"* * *

"(b) the broadcasting, televising, recording, or photographing of investitive, ceremonial, or naturalization proceedings; and

"(c) the broadcasting, televising, recording, and taking of photographs in the courtroom by news media during sessions of the court, including recesses between sessions * * *."

This court construed C.P. Sup. R. 11 and Canon 3(A)(7) in *State, ex rel. Grinnell Communications Corp.,* v. *Love* (1980), 62 Ohio St. 2d 399, 401 [16 O.O.3d 434], and held that broadcasting is permitted in the courtroom if the court determines that it would not distract participants, impair the dignity of the proceedings, or otherwise materially interfere with the achievement of a fair trial or hearing. In *Chandler* v. *Florida* (1981), 449 U.S. 560, the United States Supreme Court interpreted a canon of judicial conduct, similar to Canon 3(A)(7), promulgated by the Florida Supreme Court and held at 583:

"* * * [T]he Constitution does not prohibit a state from experimenting with a program [such as is] authorized by [Florida's] revised Canon 3A(7)."

The court also stated at 574-575:

"An absolute constitutional ban on broadcast coverage of trials cannot be justified simply because there is a danger that, in some cases, prejudicial broadcast accounts of pretrial and trial events may impair the ability of jurors to decide the issue of guilt or innocence uninfluenced by extraneous matter. * * * [T]he appropriate safeguard against such [juror] prejudice is the defendant's right to demonstrate that the media's coverage of his case—be it printed or broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly."

The court further stated at 578-579:

"Whatever may be the 'mischievous potentialities [of broadcast coverage] for intruding upon the detached atmosphere which should always surround the judicial process,' Estes v. Texas, 381 U.S., at 587, at present no one has been able to present empirical data sufficient to establish that the mere presence of the broadcast media [in the courtroom] inherently has an adverse effect on that process."

The court also stated at 582:

"* * * Absent a showing of prejudice of constitutional dimensions to these defendants, there is no reason for this Court either to endorse or to invalidate Florida's experiment."

The United States Supreme Court and the lawmakers of Ohio have instituted a system by which a balance may be struck between the public's right to know what goes on in a public courtroom, and a defendant's right to a fair and impartial trial. Since the procedures provided by this state were complied with, the media's presence at appellant's trial did not violate due process.

Next, appellant urges that the court of appeals erred by failing to disqualify itself from hearing this case when one of its members presided over the trial, even though that judge was not part of the panel deciding the appeal. Appellant states that Judge Peter M. Handwork presided at the trial of this case in the Court of Common Pleas of Lucas County. Four days after he imposed the death sentence on appellant, Judge Handwork was elected to the Court of Appeals for Lucas County. He was a member of that court when this case came before it on appeal. The court was then composed of Judge Handwork, Judge John J. Connors, Jr., Judge Andy Douglas and Judge Alice Robie Resnick. Appellant argues that even though Judge Handwork did not participate in deciding appellant's case, he may have exerted subtle pressure on his colleagues to affirm. He argues further, if Judge Handwork did not actually exert any pressure on the court to affirm, it might appear to the public that this was happening. Appellant contends that the court of appeals should have recused itself from this case in order to demonstrate the "appearance of a detached impartiality."

It must first be noted that Section 5(C), Article IV of the Ohio Con-

stitution and R.C. 2501.13 provide a procedure for answering questions regarding the disqualification of a judge from a case. The question must be submitted to the Chief Justice of the Ohio Supreme Court who assigns the matter to another judge or rules on it himself. Appellant submitted the question of disqualification of the entire Sixth Appellate District Court to Chief Justice Celebrezze. The Chief Justice on December 8, 1983 dismissed the affidavit of prejudice as being not well-taken. There is no authority allowing appellant to relitigate this issue. Thus, the Chief Justice's ruling is *res judicata* as to the question.

Even if we consider the merits of this issue, the state must prevail. Canon 3 of the Code of Judicial Conduct in conjunction with *United States v. Haldeman* (C.A.D.C. 1976), 559 F. 2d 31, calls for disqualification only upon a reasonable question of impartiality. Appellant has presented no facts which reasonably suggest that the Sixth Appellate District's decision was biased. It must, therefore, be assumed that the court entered judgment following proper procedures, and in compliance with the law. Accordingly, appellant's argument is not well-taken.

Appellant also maintains the proportionality review, required by R.C. 2929.05(A), must include cases outside the court of appeals' own geographical jurisdiction. Appellant argues that the court of appeals' comparison of this case with the only other Sixth Appellate District case in which the death penalty was imposed was insufficient to determine whether the death penalty was appropriate for him. According to appellant, R.C. 2929.05(A) requires the court of appeals to use, at least, all the death penalty cases in the state as a basis for comparison. In analyzing this question it must first be noted that the United States Constitution does not require any form of proportionality review. *Pulley* v. *Harris* (1984), ____ U.S. ____, 79 L. Ed. 2d 29. It is thus up to the state of Ohio to determine the correct pool of cases for comparison at each level of review. A court of appeals has best access to, and most complete information about, the cases it decides itself. A comparison between the case before it and all other similar cases it has decided could, therefore, be extremely thorough and accurate. This would be less true if a court of appeals were required to compare a case before it to cases of which it had no prior knowledge. Furthermore, similar cases from the entire state would be available for comparison at the Supreme Court level of review. Therefore, it is not reversible error that the court of appeals limited its proportionality review to cases adjudicated in the Sixth Appellate District.

## II

We must now undertake the task of independently weighing the aggravating circumstances surrounding the murder of Lisa Bates against the factors appellant has presented which mitigate against the imposition of the death penalty. R.C. 2929.05 mandates this weighing process and states in pertinent part:

"* * * [T]he supreme court shall * * * review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case * * *."

R.C. 2929.05 provides further:

"* * * [T]he supreme court shall affirm a sentence of death only if the * * * court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case * * *."

In the instant case appellant was found guilty of committing two aggravating circumstances. First, appellant was found guilty of murder while committing or attempting to commit kidnapping. Second, appellant was found guilty of murder while committing or attempting to commit rape. During the sentencing phase of his trial appellant presented evidence of the following mitigating factors: (1) his twelve-year institutionalization from age ten to age twenty-two, (2) his mental retardation, (3) his limited (third grade) education, (4) his limited ability to read and write, (5) his lack of familial support, and (6) his history of alcoholism. After careful consideration of the cumulative effect of these mitigating factors on appellant at the time he took the life of Lisa Bates, we can come to no other conclusion than that these factors do not outweigh the heinous nature of the aggravating circumstances surrounding her murder.

### III

Our final determination must be whether the death sentence is appropriate in this case. R.C. 2929.05(A) provides in pertinent part:

"* * * [T]he supreme court shall * * * determine * * * whether the sentence of death is appropriate. In determining whether the sentence of death is appropriate, the * * * supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. * * *"

R.C. 2929.05 continues:

"* * * [T]he supreme court shall affirm a sentence of death only if * * * [it] is persuaded from the record * * * that the sentence of death is the appropriate sentence in the case."

In the instant case the circumstances surrounding the kidnapping, rape and murder of seven-year-old Lisa Bates leave us hard pressed to conceive of a situation in which the death sentence would be more appropriate. Capital punishment can not be viewed as excessive in this case when compared to its imposition in *Jenkins* for murder coupled with armed robbery. Nor can it be considered excessive in light of *State* v. *Maurer, supra,* where the death penalty was imposed for murder coupled with kidnapping. A review of these cases and the other cases in Ohio where the death penalty has been imposed has led this court to the conclu-

sion that capital punishment is neither excessive nor disproportionate to the penalty imposed in similar cases. We, therefore, affirm the court of appeal's finding that the death sentence is appropriate in this case.

## IV

In conclusion, we first find that there is no merit to any of the specific issues raised by appellant concerning the proceedings below. Second, we find that the aggravating circumstances of kidnapping and rape outweigh any and all of the mitigating factors presented by appellant. Third, we find the sentence of death to be appropriate in this case, as it is neither excessive nor disproportionate to the penalty imposed in similar cases. Thus, in accordance with R.C. 2929.05(A) we affirm the conviction and sentence of death in this case.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

CELEBREZZE, C.J., SWEENEY, LOCHER, HOLMES and C. BROWN, JJ., concur.

WRIGHT, J., concurs in part and dissents in part.

W. BROWN, J., retired, of the Supreme Court of Ohio, sitting for DOUGLAS, J.

WRIGHT, J., concurring in part and dissenting in part. I concur with Justice William Brown's well-reasoned opinion except for that portion dealing with the imposition of the death penalty. The Ohio Revised Code places upon each member of this court the heavy burden of reviewing anew the record and independently weighing the aggravating circumstances against those factors mitigating against the death sentence. The appellant committed a heinous and outrageous crime, the nature of which cries out for the maximum sentence provided by law. The aggravating factors clearly outweigh the mitigating circumstances — save one. It is undisputed that the appellant has a mental and emotional age of a child between the ages of ten and twelve years.

I recognize that my position will not be one that is popular; however, I cannot sanction the electric chair for a person with the mentality of a child in the fifth grade. Accordingly, I would vote for a life sentence with thirty years of actual incarceration.

Thus, I must respectfully dissent from the majority holding as to the penalty to be imposed on appellant.