OPINION
Defendant-appellant Nathan "Boo" Herring (Herring) appeals his convictions in Jefferson County Common Pleas Court. Herring was convicted of, among other crimes, the aggravated murders of Aaron Land (Land) and Brian Muha (Muha). This court is asked to determine three separate issues. First, this court is asked to determine whether the state presented sufficient evidence to prove beyond a reasonable doubt that Herring committed the crimes of aggravated murder with prior calculation and design. Next, this court is asked to determine whether the trial court improperly removed two potential jurors for cause from the jury. Finally, this court is asked to determine whether the trial court erred by failing to merge the firearm specifications. For the reasons discussed below, the decision of the trial court is hereby affirmed.
 FACTS
In the early morning hours of May 31, 1999, Terrell Yarbrough (co-defendant in this case) and Herring broke into the home of Aaron Land, Brian Muha and Andrew Doran located at 165 McDowell Avenue, Steubenville, Ohio. Yarbrough and Herring beat and kidnapped Land and Muha. Andrew Doran escaped from the house and called the police.
Yarbrough and Herring forced Land and Muha into Muha's Chevy Blazer. Yarbrough and Herring proceeded to drive the victims through Ohio, West Virginia and into Pennsylvania. In Pennsylvania, Yarbrough and Herring forced the victims up a hillside along U.S. 22. On that hillside both victims were shot in the head at close range.
Yarbrough and Herring immediately proceeded to drive to Pittsburgh, Pennsylvania, where Herring was caught on a bank video trying to use Muha's ATM card. While in Pittsburgh, Herring and Yarbrough robbed Barbara Vey at gunpoint of her BMW. These events occurred within hours of the murders of Land and Muha.
Yarbrough drove the stolen Blazer back to Steubenville, while Herring drove the stolen BMW back to Steubenville. Yarbrough and Herring were later apprehended. Fingerprints and blood of Herring were found in both the BMW and in the Blazer.
Herring was indicted in a twenty count indictment. The indictment included two counts of aggravated robbery, each with a firearm specification; one count of aggravated burglary, with a firearm specification; two counts of kidnapping, each with a firearm specification; one count of gross sexual imposition; six counts of aggravated murder for the murder of Land, each with firearm specifications and aggravating circumstances specifications (capital offense); six counts of aggravated murder for the murder of Muha, each with firearm specifications and aggravating circumstances specifications (capital offense); one count of receiving stolen property; and one count of grand theft. Herring's case went to trial. The jury found him guilty on all charges except for the gross sexual imposition charge. During the sentencing phase, the jury returned a recommendation of life imprisonment without parole for each of the two murders.
The trial court sentenced Herring to a total of twelve years for the firearm specifications. He received three years on each of the firearm specifications in the two kidnapping counts; three years on the firearm specifications for the aggravated murder of Land; and three years on the firearm specifications for the aggravated murder of Muha. The trial court sentenced Herring to a total of fifty-three years for two counts of aggravated robbery, two counts of kidnapping, one count of aggravated burglary, one count of receiving stolen property, and one count of grand theft. The trial court followed the jury's recommendation and sentenced Herring to two life terms in prison without the possibility of parole for the murders of Land and Muha. The trial court held that consecutive sentences were necessary to fulfill the purposes of R.C. 2929.11. Therefore, Herring was sentenced to serve the twelve years for the firearm specifications first, followed by the fifty-three year sentence for the other charges followed by the first life sentence, followed by the second life sentence. This timely appeal followed.
 ASSIGNMENT OF ERROR NO. ONE
Herring raises three assignments of error. The first of which contends:
 "THE STATE DID NOT PRESENT SUFFICIENT EVIDENCE TO CONVICT THE DEFENDANT OF THE CRIME OF AGGRAVATED MURDER DUE TO NO SHOWING OF PRIOR CALCULATION AND DESIGN."
The jury found Herring guilty of R.C. 2903.01(B). R.C. 2903.01(B) states that, "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape." The jury found that Herring was not the principal offender, but rather committed the crime with prior calculation and design. Herring claims the jury's finding is supported by insufficient evidence.
In viewing a sufficiency of the evidence argument, "the relevant inquiry is whether after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Statev. Jenks (1991), 61 Ohio St.3d 259. "The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230.
"The phrase prior calculation and design was employed to indicate a studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." State v. Taylor (1997),78 Ohio St.3d 15, 19. No bright-line test exists to determine whether prior calculation and design is present, instead each case must be decided on a case-by-case basis and viewed under the totality of the circumstances. Id. at 20; State v. Jenkins (1976), 48 Ohio App.2d 99, 102
(laying out the following three factors that may be considered to determine if the murder was committed with prior calculation and design: (1) whether the accused and the victim knew each other; (2) whether there was thought or preparation in choosing the murder weapon or the murder site; and (3) was the act "drawn out" or "an almost instantaneous eruption of events"). Neither the degree of care nor the length of time are critical factors in themselves, but they must amount to more than a momentary deliberation. Taylor, 78 Ohio St.3d at 19. Prior calculation and design can be found even when the plan to kill was quickly conceived and executed. State v. Green (2000), 90 Ohio St.3d 352, 358; State v.Gerish (Apr. 22, 1994), Mahoning App. No. 92CA85 (In this case, the plan to kill was quickly conceived and executed. Appellant followed the victims for a short period of time, yelled at them and then shot them. We held that those actions were sufficient to justify prior calculation and design despite the fact that appellant's actions occurred within a few minutes).
Viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could have found beyond a reasonable doubt that Herring committed the murders with prior calculation and design. Yarbrough and Herring went to the home of Land, Muha, and Doren that morning to perform a "lick," i.e. robbery. Testimony revealed that Yarbrough and Herring were acquainted with at least one of the victims.Jenkins, 48 Ohio App.2d at 102 (satisfying the first element). Yarbrough and Herring proceeded to kidnap Land and Muha, drive them across two state lines to a desolated location where they were marched up a steep embankment and murdered. Typically, victims that are kidnapped and taken to an isolated location and murdered is not consistent with a spur of the moment killing, but instead requires some prior calculation and design. See Green, 90 Ohio St.3d at 358 (stating that the presence of guns in a kidnapping elevates the likelihood of violence); State v. Keenan (1998),81 Ohio St.3d 133, 140 (holding that murder was committed with prior calculation and design when defendant kidnapped victim, held victim at knife point and proceeded to go to an isolated location where defendant ordered the victim to tilt his head back before defendant slit the victim's throat). Furthermore, the time it took to get to the murder site shows that it was more than a momentary deliberation to murder Land and Muha. Jenkins, 48 Ohio App.2d at 102 (satisfying the third element);Gerish, Mahoning App. No. 92CA85.
At the isolated location in Pennsylvania, allegedly Yarbrough, not Herring, shot Land and Muha in the head at close range. This action also shows prior calculation and design. State v. Campbell (2000),90 Ohio St.3d 320, 330 (holding that shooting a victim execution-style, i.e. at close range in the head, is crucial evidence of prior calculation and design).
While Herring claims in his statements to the police that he was not present when Yarbrough murdered the victims, a jury could reasonably conclude that Herring's gun was the murder weapon. It is undisputed that Herring owned a .44 magnum and days before the murders Herring was carrying the .44 magnum around in a concealed manner. Police officers found .44 bullets in Herring's home and bedroom. A forensic scientist from the FBI examined the .44 bullet found in one of the victims and the .44 bullets found in Herring's home. The scientist concluded that the bullets had the same lead composition. Furthermore, the desolated location where the victims were murdered was composed of thick weeds, white petaled rose, slash, and jagger bush surrounded by high vegetation. Photographs of Herring's left hand, right shoulder, and right leg depicted scratches consistent with the terrain where the bodies of the victims were found. From this evidence the jury could reasonably conclude, despite Herring's statements to the police that he was in the Blazer when the murders occurred, that Herring was in fact on that hillside with Yarbrough when the victims were murdered and that there was some sort of plan that Herring was involved with to kill the victims.
After the murders, Herring and Yarbrough proceeded to use Muha's Blazer. Herring's fingerprints were found in numerous places on the stolen Blazer. Also, Herring's blood was found mixed in with Land's blood in the back seat of the Blazer. Driving the victim's vehicle around suggests a plan to both use the property and deprive the victim of any way to complain about its use. State v. Coley (2001), 93 Ohio St.3d 253,264 (rehearing/reconsideration granted 12/12/01, 2001 Ohio LEXIS 3219). Therefore, use of the vehicle is evidence of prior calculation and design. Id.
Additionally Herring insists that this whole crime was Yarbrough's plan that he did not know existed. Herring claims he only went along with Yarbrough's actions because he was scared/coerced by Yarbrough. However, the facts do not support this claim. After the murders occurred, Herring committed two additional acts that show he was a knowing, active, and willing participant in the plan.
Immediately after the murders, Herring and Yarbrough drove to Pittsburgh, Pennsylvania. In Pittsburgh, Herring and Yarbrough tried to use Muha's ATM card to withdraw cash from his account. The jury could have reasonably concluded from the bank video and still photographs that Herring was not scared or threatened by Yarbrough, instead Herring was assisting Yarbrough.
While in Pittsburgh, Herring and Yarbrough robbed Barbara Vey at gunpoint of her BMW. Vey testified that Herring, not Yarbrough, was in possession of a large firearm when they robbed her. Vey also testified that Yarbrough repeatedly stated to Herring, "don't kill her." Vey described Herring as "angry" and "jumpy." Herring took the BMW and followed Yarbrough back to Steubenville where he continued to meet up with Yarbrough and drive the stolen BMW. A jury could reasonably conclude from Vey's description of Herring's behavior that Herring was in control of his own actions and was not being coerced by Yarbrough to commit any crime.
While there is no eye witness that Herring was the triggerman in the murders of Land and Muha, sufficient circumstantial evidence existed to find that Herring specifically intended to cause their deaths. See Statev. Ballew (1996), 76 Ohio St.3d 244, 249-250 (holding that Ballew may not have shot the victim, but acted in accordance with the plan when he forcibly removed the victim from the house and walked the victim to the place of the murder). The evidence reveals the presence of sufficient time and opportunity for the planning of a homicide and circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill. Therefore, a finding by the trier of fact of prior calculation and design is justified. State v. Cotton (1978),56 Ohio St.2d 8, syllabus. As such the first assignment of error is without merit.
 ASSIGNMENT OF ERROR NO. TWO
Herring's second assignment of error contends:
 "THE TRIAL COURT'S DISMISSAL OF JURORS FROM THE PANEL DEPRIVED THE PETITIONER OF HIS PROTECTIONS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION."
According to Herring, a potential juror may be excused for cause only if he/she "unequivocally" states that under no circumstances would he/she vote to impose the death penalty. Herring claims that potential jurors David Virtue (Virtue) and Letitia Carducci (Carducci) did not make "unequivocal" statements and therefore, the trial court erred in dismissing these potential jurors for cause. Herring cites R.C. 2945.25(C) in support of his claim. R.C. 2945.25(C) requires the dismissal of a potential juror for cause when the potential juror "unequivocally stated that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case."
When R.C. 2945.25(C) was adopted by the Ohio General Assembly, it was a codification of the United States Supreme Court's minimum constitutional standard required to challenge a juror based upon difficulty in imposing the death penalty that was set forth in Witherspoon v. Illinois (1968),391 U.S. 510. State v. Jenkins (1984), 15 Ohio St.3d 164, 187 (overruled on other grounds); State v. Benge (Dec. 5, 1994), Butler App. No. CA 93-06-116. Witherspoon set out a two-part test to determine whether a potential juror may be removed based upon his/her objection to the imposition of the death penalty. The Witherspoon test provided that a potential juror would be excused if: "1) they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Id. at 522-523 (emphasis added).
However, in 1985, the United States Supreme Court modified the minimal constitutional standards required for the removal for cause of a potential juror in a capital case. Wainwright v. Witt (1985), 469 U.S. 412;State v. Moore (1998), 81 Ohio St.3d 22, 27 (stating that theWitherspoon holding was "substantially altered" by Witt); State v.Rogers (1985), 17 Ohio St.3d 174, 177 (vacated on other grounds, stating that it is "unmistakably clear" that the Witherspoon standard was modified by the holding in Witt); State v. Wilson (Oct. 12, 1994), Lorain App. No. 92CA5396 (stating that Witt modified Witherspoon). The United States Supreme Court held that the proper standard for determining when a potential juror may be excluded for cause based on his/her views on the death penalty is when those views would "prevent or substantially impair" the juror's performance of his/her duties as a juror. Witt, 469 U.S. 412, citing Adams v. Texas (1980), 448 U.S. 38, 45; State v. Madrigal (2000),87 Ohio St.3d 378, 391, citing Rogers, 17 Ohio St.3d at 174; State v.Scott (1986), 26 Ohio St.3d 92, 97 (explaining that the Witt test dispenses with the "automatic" decision-making and the unmistakable clarity standards that the Witherspoon test required).
In 1985, the Ohio Supreme Court held that the Witt standard was applicable in Ohio through R.C. 2945.25(O). Rogers, 17 Ohio St.3d at 178;Scott, 26 Ohio St.3d at 97; State v. Buell (1986), 22 Ohio St.3d 124,139; Wilson, Lorain App No. 92CA5396. Under R.C. 2945.25(O), a juror in a criminal case may be excused for any reason other than those listed in 2945.25(A)-(N) that renders him/her unsuitable to serve as a juror. (Emphasis added). If a potential capital juror satisfies the Witt
standard, that juror is unsuitable to serve as a juror. State v. Greer
(1988), 39 Ohio St.3d 236, 248 (emphasis added); Wilson, Lorain App No. 92CA5396 (emphasis added). Therefore, while Herring insists the proper standard for removing a juror for cause requires an unequivocal statement by the juror that he/she will neither follow the instructions of the court nor consider fairly the imposition of a death sentence, the above recitation of the law establishes that the proper standard is that the potential juror's views on the death penalty will "substantially impair" his/her ability to perform his/her duty as a juror.
Absent an abuse of discretion, an appellate court will not disturb a trial court's ruling on a challenge for cause. Scott,26 Ohio St.3d at 124; State v. Tyler (1990), 50 Ohio St.3d 24, 31. In applying the Witt
standard to the facts of each case, an appellate court is required to give deference to the trial court's assessment that a juror is unable to apply the law. Buell, 22 Ohio St.3d at 98-99, citing Witt,469 U.S. at 425-426. The trial court is in the best position to view the juror's demeanor, voice inflection, and gestures. State v. Beuke (1998),38 Ohio St.3d 29, 38.
In the case at bar, it is clear from a reading of the record that these two potential jurors are unsure whether they could sign a death verdict and therefore, their views will substantially impair their ability to perform their duties as jurors. Potential juror Carducci stated five times that she did not know whether she could sign a death verdict if the facts and law rendered that determination. When pushed by the state to give a yes or no answer, potential juror Carducci stated three times that she could not sign a death verdict. However, she also acknowledged that certain facts and circumstances warrant the death penalty. Upon questioning by the defense, potential juror Carducci stated that until she heard the facts, she did not know whether she could impose death. The trial court excused her for cause.
Potential juror Virtue was just as unsure, if not more unsure than potential juror Carducci, on whether he could sign a death verdict. Potential juror Virtue stated three times that he did not know whether he could sign a death verdict. He stated three times that he guessed he could sign a death verdict. He stated once that he could sign a death verdict. He stated four times that he could not sign a death verdict. Additionally, potential juror Virtue stated that he would lean to another form of punishment because it was available. The trial judge dismissed him for cause stating, "I don't believe he could follow the law."
Viewing the responses of the potential jurors to the aforementioned law and the following cases, the decision of the trial court to excuse the potential jurors for cause is upheld. In Madrigal, the court stated that a juror's lack of definitive answers could lead the trial court to properly exclude the juror for cause. In Wilson, the Ninth Appellate District upheld the trial court's decision to remove a potential juror for cause when the juror stated that she would have a difficult time following the law that imposes death. In Benge, the Twelfth Appellate District upheld the removal of a potential juror for cause when the juror stated that she would not be able to sign a death verdict and then stated that she could fairly consider the imposition of the death penalty. "The fact that defense counsel could elicit somewhat contradictory viewpoints does not in and of itself render the court's judgment erroneous." Beuke,38 Ohio St.3d at 38. As such this argument without merit.
Herring also contends that the exclusion of these potential jurors violated his right to a fair cross-section of the community. However, jurors "are not required to reflect the composition of the community at large," and "persons opposed to the death penalty do not constitute a `distinctive group' for purposes of a cross-section claim." Moore,81 Ohio St.3d 22, 26, citing Lockhart v. McCree (1986), 476 U.S. 162. Therefore, this argument fails and this assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. THREE
Herring's third assignment of error contends:
 "THE SENTENCE IMPOSED ON NATHAN HERRING IN REGARDS TO THE GUN SPECIFICATIONS IS CONTRARY TO LAW."
The state claims that any issue raised under this assignment of error is moot due to the imposition of two life sentences without parole. The Ohio Supreme Court has stated that "a prison sentence is rendered moot by the imposition of the death sentence." State v. Campbell (1994),69 Ohio St.3d 38, 58 (addressing the question of whether a trial court can properly sentence a defendant to death and sentence the defendant to a prison term that serve consecutively to each other). In 1995 the Eleventh District Court of Appeals extended the Supreme Court's ruling to life imprisonment without parole, holding that a prison term served consecutively to the life term is moot. State v. Davie (Dec. 27, 1995), Trumbull App. No. 92-T-4693 (addressing the same issue as was before the Supreme Court in Campbell, but in regards to a sentence of life imprisonment without parole, instead of the death penalty). InCampbell, even though the Supreme Court held that the issue was moot, it still addressed the merits of the issue, and found no error. Campbell,69 Ohio St.3d at 58. Therefore, we will follow the Supreme Court's lead and also address the merits of the issue.
Out of the nineteen offenses Herring was convicted of, seventeen included firearm specifications. The jury found Herring guilty of all seventeen firearm specifications. At sentencing, the trial court stated that the firearm specifications are separate for each victim and separate for the kidnapping offenses and the aggravated murder offenses. Therefore, the trial court sentenced Herring to three years for the firearm specification associated with the kidnapping of Land, three years for the firearm specification associated with the kidnapping of Muha, three years for the firearm specification associated with the aggravated murder of Land, and three years for the firearm specification associated with the aggravated murder of Muha. This totaled a twelve year sentence for the firearm specifications. The sentence on the firearm specifications ran consecutive to all other sentences including the two life without parole sentences.
Herring failed to object to the sentence at trial. Therefore, a plain error analysis is applicable. However, the imposition of multiple three year sentences when all underlying felonies arose from the same act or transaction constitutes plain error. State v. Williams (1996),115 Ohio App.3d 24, 33, citing State v. Suttles (Feb. 27, 1995), Hocking App. No. 94CA9.
R.C. 2929.14(D)(1)(a)(I) provides:
 "Except as provided in division (D)(1)(b) of this section, if an offender who is convicted of or pleads guilty to a felony also is convicted of or pleads guilty to a specification of the type described in * * * section 2941.145 of the Revised Code that charges the offender with having a firearm on or about the offender's person or under the offender's control while committing the offense * * * or using it to facilitate the offense, * * * the court, after imposing a prison term on the offender for the felony * * * shall impose an additional prison term, determined pursuant to this division. * * * If the specification is of the type described in section 2941.145
of the Revised Code, the additional prison term shall be three years. * * * A court shall not impose more than one additional prison term on the offender under this division for felonies committed as part of the same act or transaction." (Emphasis added).
"Transaction," as used in the above section, is defined as "a series of continuous acts bound together by time, space, and purpose, and directed toward a single objective." State v. Kehoe (1999), 133 Ohio App.3d 591,616, quoting State v. Wills (1994), 69 Ohio St.3d 690, 691. In order for the gun specifications to run concurrently, the crimes committed must be part of the "same act or transaction."
Herring divides this assignment of error into three separate arguments. First, Herring argues that the firearm specifications on the two counts of kidnapping should be merged. Second, he argues that the firearm specifications on the two counts of aggravated murder must be merged. Finally, he argues all firearm specifications must merge.
 MERGING THE FIREARM SPECIFICATIONS ON THE TWO COUNTS OF KIDNAPPING
Crimes committed against different victims may be the basis for imposing consecutive firearm specifications. Kehoe, 133 Ohio App.3d 591. Some appellate courts have held that when there are two different victims, then there are two different objectives. Id.; State v. Gary
(Feb. 14, 2002), Cuyahoga App. No. 79224. Therefore, the act of killing one victim does not arise out of the same transaction as killing the second victim.
In Kehoe, appellant attempted to shoot two different people within moments of each other. 133 Ohio App.3d 591. The attempt to shoot the first person happened while appellant was positioned in a vehicle. Appellant then exited the vehicle, adopted a shooting stance and shot at the second person. Id. In affirming the consecutive sentences on the firearm specifications, the appellate court stated that appellant "should serve no less time because of the coincidental proximity of the victims." Id. citing Wills, 69 Ohio St.3d 691.
In Gary, appellant raped two girls at gunpoint. Cuyahoga App. No. 79224. The rapes occurred within moments of each other. The court stated that the rapes were not part of the same act or transaction for purposes of firearm specifications because the objective of each rape was different. Id. The objective of the first rape was to rape the first victim, while the objective of the second rape was to rape the second victim. Id.
We are inclined to follow the reasoning of these courts. Despite the same time and location of the two kidnappings, there were two distinct objectives. The first objective was to kidnap Muha. The second objective was to kidnap Land. Therefore, the trial court did not err by not merging the firearm specifications for the kidnapping charges.
 MERGING THE FIREARM SPECIFICATION ON THE TWO COUNTS OF AGGRAVATED MURDER
As explained under Section A, two different victims equal two different objectives. Kehoe, 133 Ohio App.3d 591; Gary, Cuyahoga App. No. 79224. Furthermore, the murders of two victims in close proximity in time and space has been held to be not of the same act or transaction where the murder of the second victim resulted from the offender trying to cover-up, i.e. kill the witness, of the first murder. State v. Brown
(Feb. 9, 2001), Wood App. No. WD-00-033. While this is not the situation present in the case at hand, it does show that the objective was to kill two different people and therefore, not the same act or transaction for purposes of firearm specifications. Therefore, according to the analysis under Section A and this Section, we hold that the killing of Muha was a separate transaction from the killing of Land. As such, the firearm specifications were not required to be merged.
 MERGING ALL FIREARM SPECIFICATIONS
In State v. Hudson (Dec. 20, 1994), Jefferson App. No. 94J10, this court examined a case factually similar to the case before us now. A victim was kidnapped, driven around, beaten and then killed. This court held that the offender was properly sentenced to consecutive terms for firearm specifications attached to kidnapping and aggravated murder convictions. This court stated:
"When one reads the record in this case, it cannot be concluded that the kidnapping and the killing of the decedent amounted to the same transaction. Very obviously there was an intention to kill the decedent, but there was also a separate intention, prior to his killing to withhold him from his liberty, terrorize and torture him." Id.
This court concluded that the kidnapping and murder did not arise from the same act or transaction for purposes of firearm specifications. Id. The victims in the case at hand were robbed, kidnapped, beaten, driven across two state lines, allegedly made to perform oral sex on each other, forced to march up a hillside to an isolated area where they were shot at close range in the head. These facts do not suggest that the kidnapping and the murders were part of the same act or transaction. See Id.
In accordance with our prior holding and reasoning, this court holds that in regards to firearm specifications, the kidnappings did not arise out of the same act or transaction as the murders, and the murders did not arise out of the same transaction as the kidnappings. Therefore, the argument under this section is without merit.
For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Donofrio, J., concurs.
DeGenaro, J., concurs.