OPINION
On January 24, 1995, defendant-appellant, James R. Goff, was indicted on two counts of aggravated murder in violation of R.C.2903.01(B); three counts of aggravated burglary in violation of R.C. 2911.11(A)(1), (2), and (3) respectively; two counts of aggravated robbery in violation of R.C. 2911.01(A)(1) and (2) respectively; and two counts of grand theft, each with a specification, in violation of R.C. 2913.02(A)(1) and (4) respectively.
Both aggravated murder counts charged appellant with the purposeful killing of the victim, Myrtle Rutledge. Each of the aggravated murder counts carried a death penalty specification under R.C. 2929.04(A)(7), that is, that appellant was the principal offender in an aggravated murder which occurred while he was committing, attempting to commit, or fleeing immediately after committing aggravated burglary under Count 1 and aggravated robbery under Count 2 of the indictment. Appellant entered not guilty pleas to all charges.
The case was tried to a jury in the Clinton County Court of Common Pleas. On July 27, 1995, the jury found appellant guilty as charged of the two counts of aggravated murder with specification, of the three counts of aggravated burglary, of the two counts of aggravated robbery, and of one count of grand theft. The jury, however, found appellant not guilty of grand theft in violation of R.C. 2913.02(A)(4) and not guilty of the specifications in the two counts of grand theft.
Following a penalty phase hearing held on August 10 and 11, 1995, the jury recommended that appellant be sentenced to death on the two counts of aggravated murder. The trial court then conducted its own independent weighing of the aggravating and mitigating circumstances as required by R.C. 2929.03. The trial court found that the aggravated circumstances in this case outweighed the mitigating circumstances beyond a reasonable doubt.
By sentencing entry filed August 24, 1995, the trial court merged the two aggravated murder counts into one count of aggravated murder with an aggravated burglary specification. The trial court then adopted the jury's recommendation and sentenced appellant to death pursuant to R.C. 2929.03. The trial court also sentenced appellant to a ten to twenty-five year term of imprisonment for aggravated burglary, a consecutive ten to twenty-five year term of imprisonment for aggravated robbery, and a consecutive two year term of imprisonment for grand theft.[1]
It is from this judgment that appellant has filed this appeal in which he raises twenty-four assignments of error.
At trial, the parties established the following facts: Myrtle Rutledge was an eighty-eight-year-old grandmother who lived alone in a farmhouse on State Route 3 in Wilmington, Clinton County, Ohio. In September 1994, Rutledge was in the process of moving from her farmhouse into a new "double wide" home that had been built behind the farmhouse. On September 15, 1994, appellant and Manuel Jackson delivered furniture, including a new box spring and mattress, to Rutledge's new house around noon. After unloading the new furniture into the new home, appellant asked Rutledge if she wanted them to set up the bed in the new house. Rutledge was at first reluctant but eventually agreed. Both appellant and Jackson then entered the farmhouse and went into Rutledge's bedroom by going through the back porch, into the kitchen, through the front room, and up the stairs into the first bedroom. Thereafter, appellant and Jackson carried the dismantled bed over to the new home, making several trips, where they set up the bed. During the course of these trips, Jackson observed appellant "looking through things, snooping" in the farmhouse's front room.
After Rutledge signed the delivery sheet, appellant and Jackson went to Doan Street in Wilmington, where appellant bought $20 worth of crack cocaine. Appellant and Jackson thereafter went to appellant's apartment where they smoked the crack cocaine before they each went their separate way. Jackson testified that they smoked the crack cocaine between 1:00 and 2:00 p.m. Jackson further testified that he then did not see appellant until 1:00-1:30 a.m. the next morning on September 16, 1994.
Rodney Rutledge, Rutledge's son, stopped at his mother's house around 4:00 p.m. on September 15, 1994 to mow the lawn. His mother showed him her new furniture. When he left his mother's house around 5:30 p.m. that day, his mother's car, a 1980 blue Toyota Corolla, was in the driveway. Rodney Rutledge testified that when he drove by his mother's house six times the next day between 9:00 a.m. and early afternoon during the course of his employment, his mother's car was not in the driveway.
Rissa Walls, Rutledge's sister, talked to Rutledge over the phone on September 15, 1994 between 6:30 and 7:00 p.m. Walls testified that when she drove by her sister's house the next day on her way to work between 8:00 and 8:30 a.m., Rutledge's car was not in the driveway. Doris Caplinger, Rutledge's sister-in-law, testified that Rutledge called her on September 15, 1994 at about 9:00 p.m. Caplinger testified they talked for about ten minutes. That was the last time any of Rutledge's family members spoke to her.
Jackson testified that on September 16, 1994, between 1:00 and 1:30 a.m., he and Tim Bart saw appellant. Appellant had $80 worth of crack cocaine with him at the time. The three of them went to appellant's apartment where they smoked the crack cocaine. A couple of hours later, while the three of them were setting up a plan to steal meat at a store called Bob Carl's to trade for crack cocaine, appellant mentioned that "he knew where there was a car at, but it was stolen and * * * it was on High Street." However, Bart and Jackson did not want to get in a stolen car and the car was not further mentioned by appellant. Jackson testified that after Bart stole the meat, Bart and appellant "took off" while he (Jackson) went home. Jackson also testified that when he later ran into appellant on September 16, 1994 around noon, appellant asked him "that if anybody would ask [Jackson][,] to say that [Jackson] and [appellant] was [sic] together from 9:00 p.m. on the 15th through 3:00 a.m. on the 16th."
On September 17, 1994, Esther Crownover, Rutledge's daughter, arrived at Rutledge's farmhouse at 11:30 a.m. to pick Rutledge up to go to a family reunion. Crownover noticed that her mother's car was not in the driveway. Crownover nevertheless went into the farmhouse and yelled for her mother. When no one answered her calls, Crownover left the farmhouse thinking her mother had gone on to the reunion. When Crownover arrived at the family reunion, her mother was not there. Worried, Crownover went back to Rutledge's farmhouse. Once there, Crownover went upstairs and into her mother's bedroom where she found her mother's naked, lifeless, bloodied body on the floor. Crownover then tried to use the phone but realized she could not get a dial tone. Crownover covered her mother's body and left the house to get help.
Lee D. Lehman, M.D., a deputy coroner and pathologist for Montgomery County, testified that he performed an autopsy on Rutledge's body on September 18, 1994. Dr. Lehman testified that Rutledge's death was caused by multiple sharp and blunt force trauma which caused her to bleed to death. Dr. Lehman testified that Rutledge was stabbed repeatedly in the neck, face, head, chest and back areas with a knife. One of the stab wounds partially severed the carotid artery while another stab wound punctured Rutledge's right eye and went into her brain. Dr. Lehman testified that Rutledge would have died within three minutes of the carotid artery being severed. Dr. Lehman further testified that Rutledge also received blows to her face, head, and thighs. There were several defensive stab wounds and bruises to her hands and arms. Dr. Lehman testified there was also a contusion to the left side of the head which caused a hemorrhage to the brain.
Dr. Lehman also testified that Rutledge had a fractured larynx and a contusion on the right side of her abdomen which appeared to be a shoe print. Rutledge had several abrasions on the back of her shoulders consistent with her being pushed or shoved around the floor after she died. Rutledge also had bruising around her ankles as if she had been dragged. Dr. Lehman further testified that Rutledge had bruises on her rectum and vagina caused by a hard blunt object. Dr. Lehman opined that these bruises were most likely postmortem injuries.
Upon investigation, the Clinton County Sheriff's Office found a storm window that was on the ground and that the wires at the telephone junction box had been cut. They determined that forcible entry was made into the house through the back porch into the kitchen. A man's white tee shirt was recovered in Rutledge's bedroom as well as one pubic hair. Denise K. Rankin, a forensic scientist, testified that the pubic hair recovered from the scene was consistent with appellant's pubic hair. Rankin also testified that a piece of wood looking like the handle of a knife had also been recovered from the scene.
Rutledge's 1980 Toyota Corolla was found parked on the street at 347 North High Street in Wilmington. Linda Barkey, who lived at that address, first noticed the car parked there in the early morning hours of September 16, 1994, between midnight and 1:30 a.m. Barkey reported the vehicle to the police on September 17, 1994.
At trial, Timothy Schaffer, a friend of appellant and an admitted drug and alcohol abuser, testified that appellant stayed with him at Schaffer's trailer between September 17 and 21, 1994. Schaffer testified that appellant first asked him to sign a piece of paper admitting that he (Schaffer) had helped to commit, or committed a crime on September 15, 1994. Schaffer refused to sign. Schaffer further testified that on September 21, 1994, appellant told Schaffer that he had broken into a lady's house to rob her and that he had stabbed and choked her. Appellant told Schaffer that he had bent the knife's blade stabbing her. Appellant also told Schaffer that he had driven her car to Mulberry Street where he "wiped it down real good" before he had taken it to and left it on High Street.
Keith Lemar Jones, then an inmate at the Chillicothe Correctional Institution, testified he met appellant in January 1995 at the Southern Ohio Correctional Institution in Lucasville, Ohio, where appellant was serving time on unrelated charges. Jones testified that appellant told him he had killed an elderly woman in her late eighties on September 15, 1994. Appellant's description to Jones of the circumstances surrounding the victim's death included delivering furniture to Rutledge's new home, returning to her house that night to burglarize her, and killing her with a fishing knife or tackle. Appellant told Jones he had to get rid of Rutledge because she could identify him. Appellant also told Jones he took some money and Rutledge's Toyota Corolla which he later abandoned. Appellant used the money to buy crack cocaine which he smoked with a friend. Appellant also told Jones that after he and his friend finished smoking the crack cocaine, they went to a store called Bob Carl's where they stole meat. Jones testified that the same day appellant was indicted on January 24, 1995, Jones wrote a letter to the prosecutor's office with regard to appellant's involvement in Rutledge's death. Jones was subsequently interviewed by the Clinton County Sheriff's Office.
Upon the appeal of a death sentence, R.C. 2929.05(A) mandates a three-pronged analysis, requiring first the disposition of each assignment of error presented on appeal; second, an independent determination of whether the aggravating circumstances outweigh the mitigating factors; and finally, an independent determination of whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases within the geographical jurisdiction of the court.
 I. ASSIGNMENTS OF ERROR.
Appellant's first assignment of error is as follows:
 The trial court erred in failing to instruct the jury that it should proceed to consider life if it was unable to agree unanimously on a death sentence as requested by Defendant.
It is well-established that a trial court has broad discretion in instructing the jury.[2] Jenkins v. Clark (1982), 7 Ohio App.3d 93,100. An abuse of discretion is more than an error of law or judgment and implies that the trial court's decision is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
It is also well-established that, unless a requested jury instruction is included in the general instructions, it is prejudicial error in a criminal case to refuse to give a jury instruction which is pertinent to the case and which states the law correctly.[3] State v. Scott (1986), 26 Ohio St.3d 92,101.[4]
In the case at bar, appellant's counsel requested the following jury instruction:
 If you are unable to agree unanimously that a death sentence is appropriate under this standard of proof, you are to proceed to consider which of the life sentence verdicts (recommendations) to return.
 You are not required to determine unanimously that the death sentence is inappropriate before you consider the life sentences.
(Emphasis added.)
The trial court rejected appellant's requested jury instruction and instead instructed the jury as follows:
 You shall recommend death only if you unanimously find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. If you do not so find, you shall unanimously sign a verdict for either a sentence of life with parole eligibility after serving 20 full years of imprisonment or a sentence of life with parole eligibility after serving 30 full years of imprisonment. Verdict forms with these three options will be furnished to you.
Appellant argues that his death sentence is unreliable, and thus should be vacated, because the jury was not instructed that a solitary juror may prevent a death penalty recommendation by finding that the aggravated circumstances do not outweigh the mitigating factors. Appellant contends that because the jurors asked "[s]ince we are deciding the verdict of two separate offenses, will the sentences be served consecutive [sic] or concurrently?" during their mitigation deliberations, "[i]t may well have been that had that juror or jurors been told that they did not have to unanimously reject a death verdict before considering the life sentences, the verdict would have been for life * * *."
Our response to appellant's argument is twofold. First, appellant's contention regarding "the jury's possible motives for asking about consecutive and concurrent sentences is purely speculative." State v. Allard (1996), 75 Ohio St.3d 482, 492. Second, R.C. 2929.03(D)(2) requires the jury to determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors. "If the * * * jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the * * * jury shall recommend * * * that the sentence of death be imposed on the offender." R.C. 2929.03(D)(2). Since the jury instruction given by the trial court closely adhered to the language of R.C. 2929.03(D)(2), it was both proper and sufficient. See State v. Lawson (1992), 64 Ohio St.3d 336, 349.
We further find that our holding is consistent with the Ohio Supreme Court decision in State v. Brooks (1996), 75 Ohio St.3d 148. In Brooks, the supreme court held that it was error for a trial court, in a capital murder case, to instruct the jury that it was required to determine unanimously that the death penalty was inappropriate before it could consider a life sentence because such instruction was both incorrect and contrary to R.C.2929.03(D)(2). Id. at 159-160. While in that decision the supreme court emphasized the role of the individual juror, it did not hold that a trial court should instruct a jury that a lone juror could prevent a death penalty recommendation. Appellant's first assignment of error is overruled.
Appellant's second assignment of error is as follows:
 The trial court erred in rejecting the defendant's requested instruction on the issues of the jury having to unanimously agree to a particular mitigating factor before weighing a factor.
Appellant argues that the trial court erred in declining to instruct the jury that it need not unanimously agree on the existence of a mitigating factor before weighing that factor. Appellant argues that in rejecting his proposed instruction, the trial court failed to properly inform the jurors of their roles in the mitigation process.
In support of his arguments, appellant cites the decision of the United States Supreme Court in McKoy v. North Carolina (1990), 494 U.S. 433, 110 S.Ct. 1227. In McKoy, the Court found that a North Carolina capital sentencing law which required that the jury consider only those mitigating circumstances found unanimously violated the Eight Amendment of the United States Constitution. Id. at 444, 110 S.Ct. at 1234. The Court's holding in McKoy was based on its decision in Mills v. Maryland (1988),486 U.S. 367, 108 S.Ct. 1860, in which the Court ruled that jury instructions that create "a substantial probability that reasonable jurors * * * well may [think] they [are] precluded from considering any mitigating evidence unless all 12 jurors agree on the existence of a particular such circumstance" violate the principle that a sentencer may not be precluded from giving effect to all mitigating evidence. Id. at 375, 384,108 S.Ct. at 1865, 1870.
However, as the First District Court of Appeals held in State v. Moore (June 26, 1996), Hamilton App. No. C-950009, unreported:
 Ohio's capital sentencing scheme does not require unanimity regarding mitigating factors, and the court below did not so instruct. The court's instructions instead tracked the language of R.C. 2929.03(D)(1) and thereby precluded any perception by a reasonable juror that he could not consider any mitigating evidence unless all jurors agreed on its existence. See State v. Lawrence (1989), 44 Ohio St.3d 24, 27 * * *.
We therefore hold that the trial court properly declined to deliver the requested instruction negating the need for unanimity on mitigating factors when the substance of the requested instruction was covered in the general charge. Appellant's second assignment of error is overruled.
Appellant's third assignment of error is as follows:
 The trial court erred in implying that there had to be more than a single mitigating factor by denying the Defendant's request for an instruction of sufficiency of a single mitigating factor.
The trial court instructed the jury with regard to mitigating factors and the prosecution's burden of proof as follows:
 In making your decision you will consider all the evidence, the arguments of counsel, and all other information and all other reports which are relevant to the nature and circumstances of the aggravating circumstances or to any mitigating factors including, but not limited to, the nature and circumstances of the offense, and 1) the history and character and background of the Defendant, 2) the youth of the Defendant, and 3) any other factors that are relevant to the issue of whether the Defendant should be sentenced to death.
 You are to weigh the aggravating circumstances which you have already found against any mitigating factors which you find to exist.
* * *
 Mitigating factors must be considered collectively when they are weighed against the aggravating circumstances. The Prosecution has the burden to prove beyond a reasonable doubt that the aggravating circumstance, of which the Defendant was found guilty, outweigh the factors in mitigation of imposing the death sentence. To outweigh means to weigh more than or to be more important than. The existence of mitigating factors does not preclude or prevent the death sentence, if you find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. However, if you are not convinced by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, then you must choose one of the two life sentences.
The trial court thereafter declined to instruct the jury, as requested by appellant, that "any one mitigating factor standing alone may be sufficient to support a sentence of life imprisonment * * *." Appellant argues that the foregoing language is a correct statement of the law and corrects the implication in the trial court's instruction that it takes more than a single mitigating factor before the jury chooses a life verdict over the death verdict.
We note at the outset that appellant has not cited, and we have not found, any cases holding either that a trial court must instruct a jury that a single mitigating factor may outweigh aggravating circumstances, or that it is error for a trial court to not so instruct a jury.
After reviewing both the trial court's instruction and appellant's proposed instruction regarding the sufficiency of a single mitigating factor to support a life sentence, we find that appellant's proposed instruction, while correctly stating the law, was covered, in substance, in the general charge. State v. Moore (June 26, 1996, Hamilton App. No. C-950009, unreported. The trial court's instruction tracked the language of R.C. 2929.03(D) (1) and R.C. 2929.04(C) as well as the language of Section 503.016(A) of the Ohio Jury Instructions, 4 Ohio Jury Instructions, Section 503.016(x), at 114-115, and thus precluded any perception by a reasonable juror that he had to find more than one mitigating factor to support a life sentence.
We are mindful that the trial court's statement in its instruction that "[m]itigating factors must be considered collectively when they are weighed against the aggravating circumstances" cannot be found in the language of R.C.2929.03(D), R.C. 2929.04(C), or Section 503.016(A) of the Ohio Jury Instructions. However, "weighing aggravating circumstances against mitigating factors is a complex process. Jurors weigh mitigating factors together, not singly, and do so collectively as a jury in the context of a penalty hearing." State v. Lundgren (1995), 73 Ohio St.3d 474, 481.
We therefore hold that the trial court properly declined to deliver the requested instruction regarding the sufficiency of a single mitigating factor to support a life sentence. Appellant's third assignment of error is overruled.
Appellant's fourth assignment of error is as follows:
 The trial court erred in failing to provide a definition of mitigating factor to the jury as requested by the defendant.
Appellant argues that the trial court's failure to provide appellant's proposed definition[5] of mitigating factors left the jury not only without any guidance, but also with almost total discretion. We disagree.
We first find that, as used in R.C. 2929.04(B) and the trial court's instructions, a reasonable person could easily discern the meaning of the term "mitigating factor" from its contextual use. State v. Mason (Dec. 9, 1996), Marion App. No. 9-94-45, unreported. There is certainly no indication in the record that any of the jurors did not understand the meaning of the term "mitigating factor." We further find that the trial court's instruction fully complied with R.C. 2929.04(B)(7) and resulted in no prejudice to appellant. In addition, while the trial court is required to give a full and correct statement of the law, "[a]ny attempt to define or explain [a factor might be] viewed as an attempt to restrict that factor, and would [be] improper." State v. Rogers (1985), 17 Ohio St.3d 174, 182. Appellant's fourth assignment of error is overruled.
Appellant's fifth assignment of error is as follows:
 The trial court erred in rejecting the defendant's proposed instruction on mercy.
Appellant requested the trial court to instruct the jury to consider mercy in its sentencing deliberations as it related to the mitigating factors presented at trial.
It is well-established that "a capital defendant is not entitled to an instruction that mercy may be deemed a mitigating factor." State v. Garner (1995), 74 Ohio St.3d 49, 57. "Permitting a jury to consider mercy, which is not a mitigating factor and thus irrelevant to sentencing, would violate the well-established principle that the death penalty must not be administered in an arbitrary, capricious, or unpredictable manner." State v. Lorraine (1993), 66 Ohio St.3d 414, 417-418. We therefore hold that the trial court did not err in failing to give appellant's proposed instruction on mercy to the jury. Appellant's fifth assignment of error is overruled.
Appellant's sixth assignment of error is as follows:
 The trial court erred in instructing the jury to consider the nature and circumstances of the offense as a mitigating factor.
We find appellant's argument to be meritless. In State v. Stumpf (1987), 32 Ohio St.3d 95, the Ohio Supreme Court held that "R.C. 2929.04(B) requires the jury, trial court, or three-judge panel to `consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense * * *.'" Id. at 99. Since its decision in Stumpf, the supreme court has reaffirmed its position that R.C. 2929.04(B) requires the nature and circumstances of the offense to be included as a mitigating factor to be weighed against the aggravating circumstances when deciding whether to impose a death sentence. State v. Loza (1994), 71 Ohio St.3d 61; State v. Grant (1993), 67 Ohio St.3d 465.
Appellant, however, cites to State v. DePew (1988), 38 Ohio St.3d 275
and State v. Hicks (1989), 43 Ohio St.3d 72, for the proposition that it is error for a trial court to instruct a jury to consider mitigating factors not raised by the defendant. While appellant correctly cites DePew and Hicks for the foregoing proposition, we find that it is not inconsistent with the supreme court's holding in Stumpf, especially in light of the clear language of R.C. 2929.04(B). In addition, as in DePew, while the trial court listed the statutory mitigating factors to the jury, including the nature and circumstances of the offense, it made no further comment in its jury instruction regarding this factor. Hicks merely reaffirmed DePew.
In light of all of the foregoing, we hold that the trial court's jury instruction naming the nature and circumstances of the offense as a mitigating factor does not constitute reversible error. Appellant's sixth assignment of error is overruled.
Appellant's seventh assignment of error is as follows:
 The trial court erred in failing to instruct the jury that it should consider only the aggravating circumstances themselves and not the aggravated murder in determining punishment.
We note at the outset that appellant has not cited, and we have not found, any cases holding that a trial court is required to, or that it is error for a trial court not to, instruct a jury that it should consider only the aggravated circumstances and not the aggravated murder in determining punishment.
In the case at bar, the record shows that while the jury instructions[6] given by the trial court did not instruct the jury not to consider the aggravated murder, by the same token, they did not instruct the jury to consider the aggravated murder. We find that the trial court's instructions closely tracked the language of R.C. 2929.04(B). In addition, nothing in the record indicates that the jury was misled or confused during the penalty phase as to what it should consider. We therefore find that the trial court did not err in instructing the jury. Appellant's seventh assignment of error is overruled.
Appellant's eighth assignment of error is as follows:
 The trial court erred in failing to instruct the jury on drug impairment as a mitigating factor.
The Ohio Supreme Court has recognized that alcohol and/or drug impairment at the time of the offense is a mitigating factor which may be considered with the "other mitigating factors" of R.C. 2929.04(B)(7). See State v. D'Ambrosio (1995), 73 Ohio St.3d 141,145. (Emphasis added.) However, it is well-established that "while R.C. 2929.04(B)(7) evinces the legislature's intent that a defendant in a capital case be given wide latitude to introduce any evidence the defendant considers to be mitigating, this does not mean that the court is necessarily required to accept as mitigating everything offered by the defendant [in the mitigation phase] * * *." State v. Steffen (1987), 31 Ohio St.3d 111, 129. Consistent with the foregoing holding is the principle underlying the supreme court's holding in Garner, 74 Ohio St.3d 49, and in Grant, 67 Ohio St.3d 465, that a capital defendant may argue but is not entitled to a separate instruction on a R.C. 2929.04(B)(7) mitigating factor.
In the case at bar, while appellant is correct that "[h]is drug problem [and usage] we[re] on the lips of almost every witness who knew him," there was no evidence that appellant was alcohol and/or drug impaired at the time of Rutledge's death. In addition, while the trial court did not specifically instruct the jury with regard to drug impairment, such impairment was arguably included in the trial court's instruction to the jury to "consider all the evidence * * * relevant to * * * any mitigating factors, including * * * any other factors that are relevant to the issue of whether the defendant should be sentenced to death."[7]
In light of all of the foregoing, we hold that the trial court properly declined to deliver appellant's proposed instruction requiring specific consideration by the jury of alcohol and/or drug impairment at the time of the offense as a mitigating factor. Appellant's eighth assignment of error is overruled.
Appellant's ninth assignment of error is as follows:
 The trial court erred in failing to instruct the jury on the Defendant's diminishing tendency toward future dangerousness.
During the penalty phase, Jeffrey L. Smalldon, Ph.D., a clinical psychologist, testified that in general, people become a lot less aggressive after the age of forty-five and that "incidents of anti-social behavior, in particular violent anti-social behavior, radically decreas[e] after the age of 45." Dr. Smalldon testified however, that he could not state whether appellant would engage in violent behavior again. Appellant argues that the trial court erred in not instructing the jury that "a defendant's less likely future dangerousness was a mitigating factor after the defendant injected that issue into the mitigation phase."
In Barefoot v. Estelle (1983), 463 U.S. 880, 103 S.Ct. 3383, the United States Supreme Court held that a defendant's likelihood of committing further crimes and his future dangerousness were proper considerations in determining a sentence in a capital case. Id. at 896-897, 103 S.Ct. at 3396. The Supreme Court, however, did not hold that a jury must be instructed on such future dangerousness or lack thereof. Similarly, in Skipper v. South Carolina (1986), 476 U.S. 1,106 S.Ct. 1669, while the Supreme Court held that the exclusion, from the sentencing hearing in a capital case, of evidence regarding the defendant's good behavior in jail deprived the defendant of his right to place before the sentencer relevant evidence in mitigation of punishment, id. at 4-8, 106 S.Ct. at 1671-1673, the Supreme Court did not hold that a defendant is entitled to a specific instruction on each mitigating factor raised by the defendant. Rather, the Supreme Court held that such evidence of good behavior was relevant mitigating evidence which should not have been excluded from consideration by the trial jury. Id.
In the case at bar, unlike in Skipper, appellant was not prevented from introducing evidence of diminishing tendency toward future dangerousness in mitigation of punishment. In addition, while the trial court did not specifically instruct the jury as to appellant's diminishing tendency toward future dangerousness, such tendency was arguably covered in the trial court's use of the R.C. 2929.04(B)(7) "catch all" provision in its jury instructions.
Consistent with the principle that a capital defendant is not entitled to a specific instruction on a R.C. 2929.04(B)(7) mitigating factor, see Garner, 74 Ohio St.3d 49, and Grant,67 Ohio St.3d 465, we hold that the trial court did not err in not instructing the jury with regard to appellant's alleged diminishing tendency toward future dangerousness. Appellant's ninth assignment of error is overruled.
Appellant's tenth assignment of error is as follows:
 The trial court erred in failing to instruct the jury on the issue of the defendant's positive adjustment to incarceration.
In support of his tenth assignment of error, appellant cites Skipper, 476 U.S. 1, 106 S.Ct. 1669. We find that Skipper is distinguishable from appellant's case. In Skipper, the case was remanded to the trial court for a resentencing hearing because the defendant had been denied the full opportunity to present mitigating evidence, i.e., evidence of his good behavior in jail while awaiting trial, at his original sentencing hearing. Such was not the case here. During the penalty phase, Dr. Smalldon testified that appellant was someone who "require[d] a great deal of structure, regularity, * * * [and who] need[ed] to be in a very secure, structured, predictable environment." Dr. Smalldon opined that "placed in a much more structured environment [such as prison], in all probability [appellant] would adjust quite well." Unlike in Skipper, evidence of appellant's likelihood of positive adjustment to incarceration was not excluded from consideration by the jury.
Appellant also cites State v. Seiber (1990), 56 Ohio St.3d 4, in which the Ohio Supreme Court held that a defendant's "lack of disciplinary infractions in jail qualif[ied] as mitigating evidence, though of minimal significance." Id. at 9. The supreme court did not hold, however, that evidence presented during the penalty phase of a defendant's good behavior in prison necessitated a jury instruction.
In light of Garner, 74 Ohio St.3d 49, and Grant, 67 Ohio St.3d 465, and in light of the fact that evidence of appellant's likelihood of positive adjustment to incarceration was not only presented to the jury during the penalty phase, but was also arguably covered by the trial court's use of the "catch all" provision of R.C. 2929.04(B)(7) in its jury instructions, we hold that the trial court did not err in not instructing the jury as to appellant's positive adjustment to incarceration. Appellant's tenth assignment of error is overruled.
Appellant's eleventh assignment of error is as follows:
 The trial court erred in failing to instruct the jury on the mitigating factors that the defendant injected into the proceedings and the burden of proof.
In the case at bar, appellant's counsel requested that the court instruct the jury on the following mitigating factors which appellant injected into the penalty phase: (1) appellant's personality disorder, or emotional disturbance; (2) residual doubt; (3) appellant's potential for rehabilitation; (4) appellant's ability to adjust to life in prison; (5) appellant's ability to lead a useful life behind bars if sentenced to life imprisonment; (6) appellant's devotion to, and care of, his family members; (7) appellant's deprivation of parental nurturing and his family environment while growing up; and (8) appellant's youth. The trial court denied appellant's foregoing request and instead gave the jury the instructions which are quoted under appellant's third assignment of error.
We note at the outset that appellant's mitigating factors Nos. 2, 4, and 8 will not be addressed under this assignment of error because residual doubt will be addressed under appellant's twelfth assignment of error, appellant's ability to adjust to life in prison was addressed under appellant's tenth assignment of error, and the trial court's instructions to the jury included instructions pertaining to appellant's youth.
With regard to appellant's other listed mitigating factors, we find that the trial court did instruct the jury, following the statutory language of R.C. 2929.03(D)(1) and R.C. 2929.04(B) and (C), that mitigating factors included, but were not limited to, appellant's youth, the history, character and background of appellant, and any other relevant factors. "While the trial judge might have tailored the instructions more to the evidence, such an approach is not required. The trial judge did not misstate the law. Nor did he exclude consideration of possible mitigating factors * * *." State v. Landrum (1990), 53 Ohio St.3d 107, 122.
We therefore hold that the trial court did not err in failing to instruct the jury on several separate mitigating factors framed by appellant's counsel where the trial court followed the applicable statutory language in instructing the jury on mitigating factors, and where it did not exclude consideration of possible mitigating factors. Appellant's eleventh assignment of error is overruled.
Appellant's twelfth assignment of error is as follows:
 The trial court erred in failing to instruct the jury on the issue of residual doubt as a mitigating factor.
Residual doubt of guilt is defined as a "lingering uncertainty about facts, a state of mind that exists somewhere between `beyond a reasonable doubt' and `absolute certainty.'" Garner,74 Ohio St.3d at 56. While the Ohio Supreme Court has previously recognized residual doubt to be "a mitigating factor included within the `other factors' of R.C. 2929.04(B)(7)" and a proper subject of jury consideration during the penalty phase of a capital case, Grant, 67 Ohio St.3d at 481, the supreme court now agrees with "the overwhelming weight of authority * * * that a defendant is not entitled to an instruction on residual doubt." Garner, 74 Ohio St.3d at 56-57. Accordingly, the trial court did not err in failing to instruct the jury on residual doubt. Appellant's twelfth assignment of error is overruled.
Appellant's thirteenth assignment of error is as follows:
 The trial court erred in failing to instruct the jury regarding parole.
Appellant requested that the jury be instructed about the circumstances of release from prison on parole, and more specifically as to the actual number of years of a life sentence he would be required to serve before being eligible for parole. Appellant argues it was error for the trial court to not so instruct the jury, especially in light of the fact that the jury asked a question on this issue. The jury's question referred to by appellant read as follows: "Since we are deciding the verdict of two separate offenses, will the sentences be served consecutive [sic] or concurrently?"
Our response to appellant's argument is twofold. First, appellant's contention regarding the jury's possible motives for asking the foregoing question is purely speculative. Allard,75 Ohio St.3d at 492. Second, "[r]elease on parole, other than as specified after a minimum of twenty or thirty years in a life sentence, does not relate to the specified statutory factors [in Ohio's death penalty statute] and is a nebulous area which the trial court may legitimately avoid." State v. Mills (1992),62 Ohio St.3d 357, 374.
In the case at bar, the trial court denied appellant's request, stating that "each Juror ha[d] been questioned individually concerning [parole] during the voir dire and I'm sure they understand that." Subsequently, at the beginning of the penalty phase, the trial court clearly explained to the jury that if appellant was given one of the two life imprisonment sentences, he would serve life in prison with the possibility of parole eligibility only after serving twenty or thirty "full years." Thus, it is unlikely that the jury would have been confused on this issue and would have been more likely to recommend the death penalty. Under these circumstances, the trial court's refusal to instruct the jury on parole issues was not error. Appellant's thirteenth assignment of error is overruled.
Appellant's fourteenth assignment of error is as follows:
 The trial court erred in rejecting the defendant's requested instruction on reasonable doubt during the mitigation phase.
Appellant argues that the trial court erred in refusing appellant's request to instruct the jury that "[r]easonable doubt is present when you are not firmly convinced that death is the appropriate punishment." Appellant's argument has no merit.
In the case at bar, the trial court properly instructed the jury on reasonable doubt[8] in accordance with the definition set forth in R.C. 2901.05(D). It is well-established that any amplification upon the statutory definition of "reasonable doubt" as set forth in R.C. 2901.05(D) is inadvisable. State v. Van Gundy (1992), 64 Ohio St.3d 230, 235-236. Furthermore, in rejecting a defendant's proposed identical instruction, the Ohio Supreme Court held that "[t]he statutory language [of R.C.2929.03(D)(2)] requires the jury to balance aggravation and mitigation; it does not empower the jury to decide, without regard to that balance, whether the death sentence is `appropriate.' Since the instructio[n] given adhered as closely as possible to the language of R.C. 2901.05(D), [it was] both proper and sufficient." Lawson, 64 Ohio St.3d at 349. Appellant's fourteenth assignment of error is overruled.
Appellant's fifteenth assignment of error is as follows:
 The trial court erred in its independent weighing process by requiring that a mitigating factor rise to the level of a complete defense before considering the factor.
Conducting its own independent weighing of the aggravating and mitigating circumstances in its August 18, 1995 decision, the trial court made the following finding:
 Any other factors that are relevant to the issue of whether the offender should be sentenced to death:
* * *
 (b) The Defendant has argued that he suffered from alcohol and/or drug impairment at the time of the offense.
 Although there was evidence that the Defendant had used crack cocaine earlier in the day, there was no evidence that at the time of the offense he had used alcohol or was under the influence of either alcohol or crack cocaine at the time of this offense. Furthermore, the use of alcohol or drugs is not an excuse for committing a crime. The court assigns no weight to this as a mitigating factor.
Appellant argues that the trial court's foregoing statements show that the trial court refused to consider the drug/alcohol abuse as a mitigating factor and instead required the abuse to rise to the level of a defense in order to receive consideration. We disagree.
Mitigating factors are defined as "those which `do not constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability.'" Steffen, 31 Ohio St.3d at 128, fn. 18. While "a defendant in a capital case [should] be given wide latitude to introduce any evidence [he] considers to be mitigating, this does not mean that the court is necessarily required to accept as mitigating everything offered by the defendant * * *." Id. at 129. The assessment of and weight to be given to mitigating evidence are matters for the trial court's determination. "The fact that an item of evidence is admissible under R.C. 2929.04(B)(7) does not automatically mean that it must be given any weight. * * * [T]he court in its own independent weighing process, may properly choose to assign absolutely no weight to this evidence if it considers it to be non-mitigating." Id.
In the case at bar, we find that while the trial court's statement that "the use of alcohol or drug is not an excuse for committing a crime" is arguably inartful, but see State v. Clark (1988), 38 Ohio St.3d 252, 264 (in which the Ohio Supreme Court found that a defendant's drug addiction did not require him to kill in the course of a robbery, and thus did not weigh heavily, if at all, in mitigation), it does not, contrary to appellant's assertion, require the drug or alcohol use to rise to the level of a defense before it can be considered as a mitigating factor.
The record shows that the trial court did consider appellant's use of alcohol and/or drug in its independent weighing process but chose to assign absolutely no weight to it. In light of Steffen and the fact that neither side offered any evidence that appellant was alcohol and/or drug impaired at the time of the offense, we find no error in the trial court's failure to view appellant's use of alcohol and/or drug as mitigating under R.C.2929.04(B)(7). Appellant's fifteenth assignment of error is overruled.
Appellant's sixteenth assignment of error is as follows:
 The trial court erred in not granting the defendant's challenge for cause of Prospective Juror Milton Murphy.
During voir dire, prospective juror Milton Murphy ("Murphy") expressed some reservation about the use, at trials, of testimony by psychologists, stating that "sometimes it [was] used too much." The trial court denied appellant's motion to excuse Murphy for cause. Appellant eventually used a peremptory challenge to excuse Murphy. Appellant now argues that he was prejudiced by the trial court's refusal to excuse Murphy for cause, thus forcing appellant to use a peremptory challenge to excuse Murphy.
R.C. 2313.42 states in relevant part that:
 The following are good causes for challenge to any person called as a juror:
* * *
 (J) That he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court.
R.C. 2945.25 in turn provides in relevant part:
 A person called as a juror in a criminal case may be challenged for the following causes:
* * *
 (B) That he is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial[.]
It is well-established that a "trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion." State v. Tyler (1990),50 Ohio St.3d 24, 31. "Abuse of discretion" connotes more than an error of law or of judgment and implies that the court's attitude is unreasonable, arbitrary or unconscionable. Sowers v. Middletown Hosp. (1993), 89 Ohio App.3d 572, 581. Consequently, when applying the foregoing standard, an appellate court is not free to substitute its judgment for that of the trial court. Berk v. Matthews (1990), 53 Ohio St.3d 161, 169.
In addition, in Berk, the Ohio Supreme Court further indicated that the fact that the trial court has the opportunity to observe the demeanor of the prospective juror and evaluate firsthand the sincerity of the juror's responses to questions is of considerable significance in the appellate review of these decisions. Id.
Applying the foregoing standards, we now turn to Murphy's responses during voir dire. After Murphy expressed his opinion that psychological testimony was sometimes used too much, appellant's counsel inquired further:
 Q. [by Michael P. Kelly, counsel for appellant] Okay. Under what circumstances would you say that you think it's used too much?
 A. I mean, in just general. I mean, I read about cases, that you know, that they use things like that as an excuse for what has been done, and sometimes I don't think that is right.
* * *
 Q. Do you feel that the death penalty is the, even if the Judge were to instruct you otherwise, would you feel that the death penalty is the only appropriate penalty if James were to be found guilty of murdering Myrtle Rutledge while committing a robbery or a burglary or both?
 A. I don't think it's the only one, but it's one to consider.
 Q. Do you think it's the better choice, or do you think it's just another choice?
A. I think it's just another choice.
 Q. Would you give the other two, the life with full 30 and life full 20, would you give that consideration also?
A. I mean yes, I'd look at them.
 Q. And if the State didn't convince you beyond a reasonable doubt that the aggravated circumstances outweigh the mitigating factors, would you vote for something other than death?
 A. Yes, if they didn't prove to me beyond a reasonable doubt, yes, I could.
 Q. Now, I want to get back to the psychologist again. Because, if we get to that phase, it is likely that the majority, almost vast majority of the Defense presentation will be testimony of that nature. And, you can see how it would concern me if you just would think that that [sic] was whistling in the wind, that it just wasn't worth hearing?
 A. Not that it is not worth hearing, I just, you know, I would be willing to listen, but it seems to me it's used a good bit a lot of the time.
 Q. Do you think your opinion that it's used a good bit a lot of the time to avoid responsibility, would prevent you from giving that testimony the same proper consideration that you give all other testimony?
A. I'm sure I would listen to it and consider it.
 Q. Would you be able to give it the same consideration and look at it under the same rules, as the Court would instruct you, as you would all other testimony?
A. I think I could try.
 Q. I might be able to try and climb Mt. Everest, but I don't think I could do it. Other than try, do you, I hate to pressure you on this?
 A. Well, I mean, I am not sure how to answer either, I mean, I could listen and see what they had to say. But that is just my feeling on it.
* * *
 A. The only thing I could say is I would be willing to listen. But, you know, my opinion is that I have seem to [sic] of heard and read that there is a lot of that testimony as an easy way out, to explain what has been done. Sometimes I don't feel it's all that right. I mean maybe there is more merit to it than I know.
 Q. Do you think that that [sic] opinion would then cause you to be more likely to vote for the death penalty in spite of whatever the Judge's instructions?
A. Not believing in that as much.
Q. Yes?
 A. I don't know whether it would or not, make me tend to vote that way more.
Appellant's counsel thereafter moved to excuse Murphy for cause, opining that "[Murphy's] answers [were] such that [Murphy] would not be able to vote for anything other than death." Thereafter, plaintiff-appellee, the state of Ohio (the "State"), inquired as follows:
 Q. [By William E. Peelle, prosecuting attorney] And if the aggravated circumstances do not outweigh the mitigating factors by proof beyond a reasonable doubt to you, that you will recommend to the Judge a sentence not of death, but in accordance with the instructions of law as given by the Court, either life without parole eligibility for 30 years or life without parole eligibility for 20 years. Can you and will you do that?
A. Yes.
* * *
 Q. And that possibly, if aggravated circumstances proven to you beyond a reasonable doubt to outweigh [sic] the mitigating factors, you would then have to recommend the death penalty?
A. Yes.
 Q. Can you assure me, can you assure the Court, can you assure the Defense team that you can and will follow the instructions as given to the Judge, if you become a juror on this panel with regard to the sentencing phase and the 3 alternatives that can be recommended, subject to the instructions of the Court that we have just reviewed?
A. You're asking me if you can?
 Q. Yes, can and will you follow the instructions of the Court?
A. Yes.
Thereafter, the trial court inquired as follows:
 THE COURT: Okay. I guess I would only have one question for you. And, I think Mr. Kelly has indicated that if you get to this stage that some of the mitigating factors that he may present would be in the form of a professional who is a psychologist. And can you consider that testimony of the psychologist, can you sit there and weigh his credibility according the [sic] instructions which I would instruct you to?
 A. I could sit there, I mean, I would be willing to listen, yes.
 THE COURT: I'm going to over rule [sic] your motion.
While Murphy expressed reservation as to the use in general of psychologists' testimony, he also stated that in this particular case, he would be willing to listen to it and consider it. Murphy further stated that death penalty was just another choice, that he would follow the law and the jury instructions, and that he could impose a life sentence if aggravating circumstances did not outweigh mitigating factors. At no time did Murphy state he had any preconceived opinion as to appellant's guilt or innocence as a result of Murphy's reservation about the use of psychologists' testimony at trials.
Therefore, in light of Murphy's foregoing statements, the guidelines set forth in Beck, 53 Ohio St.3d 161, and Tyler,50 Ohio St.3d 24, and in particular, the position of the trial court relative to the demeanor of the juror, we cannot say that the trial court's refusal to excuse Murphy for cause constituted an abuse of discretion. Accordingly, appellant's sixteenth assignment of error is overruled.
Appellant's seventeenth assignment of error is as follows:
 The trial court erred in permitting the government to introduce a document [sic] extraneous and self-serving references about the defendant's tendency toward violence that the defendant used to only refresh the recollection of a witness.
Manuel Jackson, who delivered furniture to Rutledge with appellant on September 15, 1994, testified on behalf of the State. During cross-examination, Jackson was asked if he was working with the Clinton County Sheriff's Office on or about September 20, 1994[9] in the investigation of Rutledge's murder. When Jackson responded negatively, appellant's counsel asked Jackson about a letter he had written to a Clermont County trial judge, (the "first letter"), as follows:
 Q. [By Michael P. Kelly, counsel for appellant] Did you tell the Judge in Clermont County that you were, when you were in jail, that you were working with Colonel Smith and that he wanted to put you in the cell to try to get a confession out of James?
A. Not that I recall, no.
 Q. Do you remember writing a letter to Judge McBride, who was your Municipal Court Judge?
A. Yes.
 Q. Do you remember telling him in that letter that they wanted to put you in a cell to get a confession?
A. No, I don't remember.
 Q. Now, I'll show you this and just ask you to look at it and read it to yourself just for the purpose of refreshing your recollection.
 (Thereupon, the witness looked at a document that was handed to him by Mr. Kelly)
 Q. There is a second page if you want to check the signature. Now, have you had a chance to look that over?
A. Yes, I have.
Q. Does that refresh your recollection?
A. Yes, it does.
 Q. Now, having your recollection refreshed, did you, in fact, tell Judge McBride that?
A. In that letter, yes.
 Q. I'm asking you now, forget that, I'm asking you, you don't remember doing that?
A. No.
 Q. Do you remember writing Judge McBride another letter that told him you had learned your lesson, and wanted to get out of jail early?
A. Yes.
* * *
 Q. You told Judge McBride, who was the Clermont County Judge, you had learned your lesson and the purpose of that was to get out of jail, wasn't it?
A. Yes.
Q. And it worked for you, didn't it?
A. Yes.
 Q. And you got out three months early for having learned the lesson of the crime you committed?
A. I got out 20 days early.
Q. I thought you got a six month?
A. Six months, three months suspended.
 Q. Okay, so you got out 20 days early for learning your lesson?
A. Yes.
(Emphasis added.)
On redirect examination, over repeated objections of appellant's counsel, the State asked Jackson about the first letter and the reasons he wrote it as follows:
 Q. [By Richard W. Moyer, prosecuting attorney] Now, Mr. Kelly pointed out that letter to refresh your recollection about maybe being offered some kind of deal to be put in a cell. Why did you write that letter?
* * *
Q. Do you need to read through that again?
A. No.
 Q. Now, I think on cross-examination you were asked concerning that letter, Mr. Kelly asked you about that?
A. Yes.
Q. Do you recognize the letter?
A. Yes.
Q. Did you write that letter?
A. Yes.
Q. Why did you write that letter?
MR. KELLY: Objection.
* * *
 Q. Did you read that letter when Mr. Kelly gave it to you?
A. Yes.
 Q. And within that letter at the time you wrote it, is there a reason given to the Court why you wrote that letter? If you need to read it again.
A. Yes.
Q. There is a reason?
A. Yes.
 Q. Do you recall what the reason was that you wrote the letter, reason for writing it?
A. Yes.
Q. What was that reason?
MR. KELLY: Objection.
THE COURT: Overruled.
 A. Deputy Doyle over at the Clermont County Sheriff's Department came to me with a suggestion of putting me in the cell with James Goff to get him to say that he did it or something.
 MR. KELLY: I object to this, and ask this all be stricken.
 Q. I'm asking you, that's what you testified to Mr. Kelly about, but I believe before that you wrote some other things to the Judge concerning your concerns.
A. To get myself some help.
 Q. Read that letter again, what does the paragraph say before you talk about yourself, not outloud, [sic] to yourself, I want to make sure you refreshed your memory on that letter.
 MR. KELLY: Objection. The question has been asked and answered and the Prosecutor has to go on to the next point.
 MR. MOYER: There could be more than one reason, Your Honor, he has given us the list, let him read the letter and refresh his recollection to see if there is any other reasons [sic] he may have had at that time.
THE COURT: Overruled.
 Q. As you read through that letter do you see any other reasons you had at that time for writing that letter?
A. Yes.
Q. What?
 A. The reason is, is that I felt like my family might be in danger because I was, I could testify against James Goff.
Q. Why did you believe that?
MR. KELLY: Objection.
THE COURT: Overruled.
 A. I just felt for my family because if I can testify against him then maybe somebody might go after my family.
 MR. KELLY: Object and ask that be stricken and the Jury instructed to ignore that.
THE COURT: Overruled.
MR. MOYER: You may re-cross, Mr. Kelly.
Under this assignment of error, appellant argues that the trial court erred in allowing the State to use the entire content of the first letter to have Jackson testify about his fears if he testified against appellant. Appellant argues that Evid.R. 612, which governs writings used to refresh memory, does not allow for the introduction and use of the entire letter, especially since appellant's counsel had used the letter solely "to refresh the recollection of the witness concerning the time that he went to Ms. Rutledge's house to deliver furniture."
We note at the outset that appellant's argument confuses two different documents used by appellant's counsel to refresh Jackson's memory on cross-examination. Appellant's counsel first used an eight page written statement made by Jackson to the Clinton County Sheriff's Office. Appellant's counsel used the statement to refresh Jackson's memory regarding the time he and appellant delivered furniture to Rutledge on September 15, 1994. Appellant's counsel subsequently used Jackson's first letter to refresh his memory regarding the reasons he wrote the letter.
Evid.R. 612 states in relevant part that:
 Except as otherwise provided in criminal proceedings by Rule 16(B)(1)(g) and 16(C)(1) (d) of Ohio Rules of Criminal Procedure, if a witness uses a writing to refresh his memory for the purpose of testifying, either: (1) while testifying; or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing. He is also entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.
(Emphasis added.)
Evid.R. 612 clearly allows an adverse party, once a witness uses a writing to refresh his memory while testifying, to inspect the writing and to cross-examine the witness on it. After thoroughly reviewing the record, we find that when appellant's counsel cross-examined Jackson as to whether Jackson wrote to the judge that the police wanted to put him in a cell to get a confession from appellant, thereby implying possible deals made by Jackson with the police, appellant's counsel's line of questioning on cross-examination opened the door on redirect for the State to question Jackson about why he wrote the first letter to the judge. We therefore find that the State's use of Jackson's letter on redirect was permissible under Evid.R. 612. Appellant's seventeenth assignment of error is overruled.
Appellant's eighteenth assignment of error is as follows:
 The trial court erred in overruling the defendants [sic] motion under Rule 29 [sic] on the Eighth Count for OHIO REV. CODE 2913.02(A)-(1).
Count 8 of the indictment charged appellant with grand theft of Rutledge's car in violation of R.C. 2913.02(A)(1).[10]
At trial, appellant's Crim.R. 29 motion was denied and appellant was eventually found guilty of grand theft. Appellant argues that the evidence presented at trial, including the testimony of Jackson, "an admitted user of crack" who never saw the alleged stolen car on High Street, was insufficient to link appellant to Rutledge's car.
It is well-established that "an appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, 273. The relevant inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, * * * any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. It is also well-established that "[m]atters such as the weight of evidence and witness credibility are primarily to be determined by the finder of fact." Grant, 67 Ohio St.3d at 477.
Rutledge's 1980 Toyota Corolla was found parked on the street at 347 North High Street in Wilmington, Ohio. Linda Barkey, who lived at that address, first noticed the car parked there in the early morning hours of September 16, 1994, between midnight and 1:30 a.m. when she went to bed. The car was still there when she got up the same day at 5:00 a.m. Barkey testified that she never saw appellant by the car. Barkey also testified that the car appeared to have remained in the same place at all times. Barkey reported the vehicle to the police on September 17, 1994.
Jackson testified that he saw appellant on September 16, 1994 between 1:00 and 1:30 a.m. Jackson testified that when he, appellant, and Tim Bart were setting up a plan to steal meat, appellant told them "he knew where there was a car at, but it was stolen and * * * it was on High Street." On cross-examination, Jackson testified that he never saw the stolen car. Jackson also testified that appellant did not tell him what kind of car it was, who stole it, or where it was on High Street.
Schaffer, a friend of appellant, testified that on September 21, 1994, appellant admitted to him that after he (appellant) broke into a lady's house and stabbed and choked her, appellant drove the victim's car to Mulberry Street where he "wiped it down real good" before he took it to, and left it on High Street. Fred W. Moeller, a Clinton County Deputy Sheriff, testified that he could not find any fingerprints, including Rutledge's own fingerprints, either on the outside or the inside of Rutledge's car. Moeller opined that "the car ha[d] been wiped down by some manner" prior to being left on High Street.
Finally, Jones, an inmate who had met appellant in January 1995 while they were both in prison, testified that appellant admitted that after he had killed Rutledge, he had taken some money and Rutledge's Toyota Corolla which he later abandoned.
After thoroughly reviewing the record, we find that the State's evidence, if believed, would allow a reasonable trier of fact to find appellant guilty of grand theft beyond a reasonable doubt. Schaffer and Jones both testified that appellant admitted taking Rutledge's car and subsequently abandoning it. Jackson testified that appellant told him about a stolen car on High Street. Appellant attacks Jackson's credibility, "but we may not `substitute our evaluation of witness credibility for the jury's.'" State v. Campbell (1994), 69 Ohio St.3d 38, 46. We therefore find that the trial court did not err in denying appellant's Crim.R. 29 motion with regard to Count 8 of the indictment. Appellant's eighteenth assignment of error is overruled.
Appellant's nineteenth assignment of error is as follows:
 The trial court erred in emphasizing the death penalty by inquiring of every juror after the defendant and the government had passed for cause the following: if the case were proper, and the facts would warrant it, and the law would permit it could you join in signing a verdict form that recommends to the Court the imposition of the death penalty?
Appellant contends that the trial court's foregoing question not only predisposed the jurors toward the death penalty, but that as a result, the "jury received an overdose of death penalty emphasis from the one neutral force in the courtroom, the judge."
We note at the outset that appellant never objected to this line of questioning by the trial court and thus waived the issue but for plain error. State v. Bock (1984), 16 Ohio App.3d 146,150. "To rise to the level of plain error, it must appear on the face of the record not only that the error was committed, but that except for the error, the result of the trial clearly would have been otherwise and that not to consider the error would result in a clear miscarriage of justice." Id.
"The proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." Rogers,17 Ohio St.3d at 174, paragraph three of the syllabus. We find that by asking the allegedly erroneous question, the trial court carried out its duty to ensure that jurors could fairly and impartially consider the death penalty in accordance with the law. R.C.2945.25(C); Lundgren, 73 Ohio St.3d at 482. We further find that, contrary to appellant's contention, the trial court's question did not imply that jurors had to impose the death penalty, and thus did not predispose any juror toward the death penalty.
In addition, in the case at bar, the trial court gave appellant's counsel wide latitude to inquire into each prospective juror's beliefs and opinions concerning the death penalty. Appellant's counsel exercised that right and questioned jurors regarding their views on capital punishment.
We therefore find that the trial court's question was proper and permissible under Rogers. Allard, 75 Ohio St.3d at 493; Lundgren, 73 Ohio St.3d at 482. Appellant's nineteenth assignment of error is overruled.
Appellant's twentieth assignment of error is as follows:
 The trial court erred in permitting the jury to consider two death penalty counts when only one person was killed.
The indictment charged appellant with one count of aggravated murder with an aggravated burglary specification (Count 1), and one count of aggravated murder with an aggravated robbery specification (Count 2). The State submitted the two counts to the jury which in turn found appellant guilty on both counts and recommended the imposition of the death penalty on both counts.
R.C. 2941.25 states that:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
Aggravated burglary and aggravated robbery are not allied offenses of similar import where the offenses are committed separately. State v. Sagle (1992), 65 Ohio St.3d 597, 611. In the case at bar, the crime of aggravated burglary was complete when appellant trespassed into an occupied structure with the intent to commit a theft offense. The distinct offense of aggravated robbery was complete when appellant, while committing a theft offense, attacked Rutledge, resulting in Rutledge's death. Appellant's offenses as charged in Counts 1 and 2 of the indictment were therefore committed separately for purposes of R.C. 2941.25 and it was proper for the jury to consider both.
Furthermore, the trial court's August 24, 1995 sentencing entry clearly shows that the trial court merged the two offenses of aggravated murder before sentencing appellant to death. We therefore find that the trial court did not err in permitting the jury to consider both aggravated murder counts. Appellant's twentieth assignment of error is overruled.
Appellant's twenty-first assignment of error is as follows:
 The trial court erred in permitting the government to argue non-statutory aggravating circumstances.
Appellant argues that during closing arguments in the penalty phase of the trial, the trial court allowed the State to argue the following non-statutory aggravating circumstances in violation of R.C. 2929.04(A): (1) appellant's "other acts" or character defects; (2) his inability to feel remorse; (3) his inability to tell the truth; (4) public sentiment; (5) public standards of behavior; (6) appellant's speculated future inability to conform to a structured environment; (7) appellant's implied future dangerousness; and (8) appellant's lack of insanity or incompetency argument. Appellant contends that letting the State argue the foregoing "infected the jury's recommendations for sentence."
We note at the outset that appellant's counsel did not object to the state's argument and thereby waived all but plain error. Bock, 16 Ohio App.3d at 150; Crim.R. 52(B). We further note that the State's alleged reference to appellant's future dangerousness is not in the record and therefore will not be addressed.
The aggravating circumstances to be weighed against the mitigating factors in the penalty phase of a capital trial are contained within R.C. 2929.04(B). "Improperly introducing nonstatutory aggravating circumstances is error." Landrum,53 Ohio St.3d at 112.
However, it is also "ludicrous to assert * * * that the jury is to be carefully fed only that information which reflects positively upon appellant. As they share in the trial court's function [of sentencing authority], the jurors require access to the wide range of information which the function requires." Greer, 39 Ohio St.3d at 253. To that effect, the Ohio Supreme Court held that:
 [C]ounsel for the state and for the defendant at the penalty stage of a capital trial may introduce and comment upon (1) any evidence raised at trial that is relevant to the aggravating circumstances specified in the indictment of which the defendant was found guilty, (2) any other testimony or evidence relevant to the nature and circumstances of the aggravating circumstances specified in the indictment of which the defendant was found guilty, (3) evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant, (4) the presentence investigation report, where one is requested by the defendant, and (5) the mental examination report, where one is requested by the defendant.
State v. Gumm (1995), 73 Ohio St.3d 413, 421. "[O]nce lawfully inserted into the sentencing considerations, admissible evidence is subject to fair comment by both parties." Id. at 420.
We now turn to the alleged non-statutory aggravating circumstances argued by the State. With regard to the State's comments on public sentiment and public standards of behavior, we agree with appellant that they were improper. However, the record shows that immediately following the State's comments, the trial court instructed the jury to disregard and ignore the State's comments. A jury is presumed to follow any curative instructions given by the trial court. State v. Henderson (1988), 39 Ohio St.3d 24,33. We therefore find that any prejudice which may have occurred was cured by the trial court's instruction.
With regard to appellant's inability to feel remorse, we note that the subject of appellant's remorse was first asserted during the penalty phase on direct examination of Dr. Smalldon, a defense witness. It was therefore subject to fair comment by both parties. Gumm, 73 Ohio St.3d at 420. In addition, "consideration of such information is crucial to the evaluations necessarily a part of the sentencing process. They comprise `the history, character, and background of the offender' which information may favor or disfavor a particular defendant, but which nevertheless `shall' be considred by the court and the trial jury." Greer,39 Ohio St.3d at 253.
Finally, with regard to the remaining alleged nonstatutory circumstances argued by the State, the record shows that they were all first asserted by appellant during the direct examinations of Dr. Smalldon and Charlotte M. Fisher, a former landlord of appellant, and a defense witness during the penalty phase. We find that these circumstances were predicated upon the actual evidence and permissible as either reflecting on the nature and circumstances of the crime or responding to the mitigating evidence offered by appellant.
We therefore find that the State did not exceed the permissible scope of its closing argument during the penalty phase. Appellant's twenty-first assignment of error is overruled.
Appellant's twenty-second assignment of error is as follows:
 The trial court erred in permitting a conviction based upon conduct of counsel that fell below the objective standard for counsel in capital cases.
Appellant argues that he was denied effective assistance of counsel at trial because of his counsel's failure to (1) object to the trial court's emphasis on the death penalty during voir dire; (2) inquire about mitigating circumstances during voir dire; (3) object to the trial court instructing the jury on two counts, rather than one count of aggravated murder; and (4) object to the non-statutory aggravating circumstances argued by the State in its closing argument at the penalty phase.
Allegations of ineffective assistance of counsel are subject to a two-pronged test. The defendant must show that, in light of all the circumstances, counsel's representation was professionally unreasonable. Strickland v. Washington (1984),466 U.S. 668, 690-691, 104 S.Ct. 2052, 2065-2066. The defendant must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. at 2068. A reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Id. at 689, 104 S.Ct. at 2065.
With regard to appellant's three contentions of ineffective assistance of counsel for failure to object, we find that they do not satisfy the first prong of the Strickland test as the mere failure of counsel to object to error, alone, is not enough to sustain a claim of ineffective assistance. State v. Holloway (1988), 38 Ohio St.3d 239, 244. In addition, appellant's contentions have already been considered under appellant's nineteenth, twentieth, and twenty-first assignments of error. We therefore incorporate our treatment of those arguments under this assignment of error and need not readdress each one separately.
With regard to appellant's contention of ineffective assistance of counsel for failure to inquire about mitigating circumstances during voir dire, we find that it is not supported by the record. A thorough review of the record shows that appellant's trial counsel consistently asked prospective jurors about their feelings regarding various mitigating factors trial counsel intended to present at the penalty phase. The mitigating factors asked about included, inter alia, a deprived childhood, a learning disability, the use of a psychologist's testimony, and an absent parent.
We therefore find that appellant was not denied the effective assistance of trial counsel. Appellant's twenty-second assignment of error is overruled.
Appellant's twenty-third assignment of error is a follows:
 The trial court erred in sentencing defendant because of the numerous errors including failing to guide the jury on imposition of the death sentence through proper instructions and other errors during the trial.
Appellant argues that the cumulative effect of the errors alleged in his sixteenth through nineteenth, twenty-first, and twenty-second assignments of error deprived him of a fair trial. We decline appellant's invitation to revisit each of these assignments of error which we have previously overruled. As we have already noted, appellant has not shown that any of the errors of law alleged in these assignments are meritorious. Consequently, we fail to see how the absence of prejudicial error can rise to the level of cumulative error. State v. Moreland (1990), 50 Ohio St.3d 58, 69. Appellant's twenty-third assignment of error is overruled.
Appellant's twenty-fourth assignment of error is as follows:
 The trial court erred in failing to grant Defendant's Constitutional Motion to Dismiss.
Under this assignment of error, appellant mounts numerous challenges to the constitutionality of Ohio's death penalty scheme in R.C. Chapters 2903 and 2929. These challenges are not sustainable.
We note at the outset that "when issues of law in capital cases have been considered and decided by [the Ohio Supreme Court] and are raised anew in a subsequent capital case, it is proper to summarily dispose of such issues in the subsequent case." State v. Poindexter (1988), 36 Ohio St.3d 1, 3.
In State v. Jenkins (1984), 15 Ohio St.3d 164, the Ohio Supreme Court held that the imposition of the death penalty does not violate the Eighth Amendment prohibition against cruel and unusual punishment and, in so holding, rejected the argument that the death penalty was unconstitutionally administered in an arbitrary and capricious manner. Id. at 168-169.
In Jenkins, the supreme court also upheld the Ohio's death penalty statutes against claims that they unconstitutionally (1) violate the right to life; (2) provide neither a deterrent nor the least restrictive penalty; (3) deprive a capital defendant of an impartial jury by having the same jury hear and decide both the guilt and penalty phases; (4) fail to provide a discernable legal standard for weighing the aggravating and mitigating circumstances; (5) fail to require the jury returning a life sentence to specify which mitigating factors were found to exist and why they outweighed aggravating circumstances; (6) fail to require premeditation or deliberation as the culpable mental state; (7) fail to require proof of guilt beyond all doubt; (8) permit the duplicative use of a felony to convict and to impose a sentence of death; and (9) fail to properly allocate the burden of proof during the penalty phase. Id. at 169-179, 187.
The Ohio Supreme Court has also upheld the death penalty statutes against claims that (1) the mitigating factors set forth in R.C. 2929.04(B)(1) through (7) are unconstitutionally vague, Stumpf, 32 Ohio St.3d at 104, and (2) R.C. 2929.05 is unconstitutionally inadequate in that it fails to specifically require inquiry and findings regarding arbitrariness, passion, or prejudice. Scott, 26 Ohio St.3d at 109.
In State v. Buell (1986), 22 Ohio St.3d 124, the supreme court upheld the death penalty statutes against the claim that they unconstitutionally fail to assure adequate appellate analysis of death sentences, id. at 136, and upheld Crim.R. 11(C)(3) and the death penalty statutes against the claim that they unconstitutionally encourage guilty pleas and therefore amount to a waiver of fundamental rights. Id. at 138-139. Finally, the supreme court has upheld the death penalty statutes against the claim that they unconstitutionally preclude the jury from exercising mercy and deciding whether death is the appropriate punishment. State v. Williams (1995), 73 Ohio St.3d 152,172-173.
The Supreme Court of Ohio having upheld the challenged statutes on each of the grounds advanced by appellant, we overrule appellant's twenty-fourth assignment of error.
 II. INDEPENDENT REVIEW
As required by R.C. 2929.05(A), we now turn to our independent determination of whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors beyond a reasonable doubt in this case.
The aggravated circumstances of which appellant was found guilty are that appellant was the principal offender in an aggravated murder which occurred while he was "committing, attempting to commit, or fleeing immediately after committing or attempting to commit * * * aggravated robbery, [and] aggravated burglary * * *." R.C. 2929.04(A)(7).
In addition to the nature and circumstances of the offense and the history, character, and background of the offender, R.C.2929.04(B) lists the following as mitigating factors:
 (1) Whether the victim of the offense induced or facilitated it;
 (2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
 (3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;
(4) The youth of the offender;
 (5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
 (6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
 (7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.
At the penalty phase of the trial, four witnesses testified on behalf of appellant. They were Melissa Fuqua, appellant's sister; Sharon Cole, a former teacher; Charlotte Fischer, a former landlord; and Dr. Smalldon. From the testimony of the witnesses, the social history provided by Dr. Smalldon, and the various records present in this case, i.e., school, juvenile, and social services records, the following picture of appellant emerged:
Appellant was born in 1975, the youngest of three children. His father to which he was very attached died of a heart attack when appellant was four years old. The death of his father traumatized appellant. After this, the family seemed to quickly deteriorate. Within a short period of time, Kentucky Social Services became involved with appellant's family. This was the first of what was to become an almost fourteen-year relationship and involvement with either Kentucky Social Services or Clinton County Children Services.
Following the death of his father, appellant's mother deteriorated both emotionally and physically. She provided very little guidance or supervision and was unable to provide basic needs for her children, such as food, shelter, and clothing. Dr. Smalldon described her parenting skills as profoundly neglectful. The living conditions were described as "squalor" and unfit for human habitation. Appellant's family moved several times during his childhood. Several homes were without heat, water, or sanitary facilities. The children were inadequately fed, clothed and supervised and left to fend for themselves.
Appellant started shoplifting when he was six years old, was first caught when he was eight or nine, and made his first formal appearance in juvenile court when he was eleven or twelve. Appellant started drinking and using marijuana before he was ten. He was subsequently engaged in poly-substance and alcohol abuse until he stopped in the late 1980s. Appellant started again in late 1992-1993. He developed a crack cocaine dependency for three months in 1994. The record indicates that appellant's mother was oblivious to her son's truancy and alcohol and substance abuse.
At home, academics were never a priority. Appellant repeated kindergarten and third grade twice. Appellant learned to play sick to avoid school and quickly fell behind. He was eventually placed in learning disability classes. Both Cole and Dr. Smalldon opined that appellant was placed in these classes not because of a learning disability or a lack of intelligence but because he had missed so much school. Appellant eventually completed tenth grade and part of his junior year.
At age thirteen, appellant was removed from his mother's house and placed at Midwestern Children's Home, and subsequently other foster homes, until he turned eighteen. Cole testified that she had appellant in seventh and eighth grade and tried to help him. By then, appellant was in foster home. Cole testified that she cared about appellant very deeply and wanted him to have more of a normal environment. Cole testified that she would pick him up every other Saturday, until he was placed in a different foster home, and would take him to a movie or to her house for a cookout. Cole testified that during that period, appellant was fun-loving, giving and affectionate.
Fisher testified that she rented an apartment in her house to appellant and Tim Schaffer from October 1993 to January 1994. Fisher testified that appellant always paid his rent on time but was eventually asked to move out because of Schaffer who was a problem. Fisher's relationship with appellant subsequently developed into a friendship. Fisher testified that appellant never lied to her or her husband and that she completely trusted him. She further testified that she tried to be a positive influence on appellant.
Dr. Smalldon testified that he had four personal interviews with appellant, totalling approximately fifteen hours, and that he also conducted several interviews with family members of appellant and other witnesses. Dr. Smalldon performed neuropsychological tests on appellant and made a clinical evaluation of appellant. The purpose of the neuropsychological examination was to determine whether appellant suffered from any substantial brain impairment or brain damage. Dr. Smalldon, from this examination, concluded that appellant had no substantial brain impairment or brain damage. From other tests he concluded that appellant was of average intelligence.
The clinical evaluation showed appellant to be suffering from a personality disorder with antisocial and narcissistic features. Dr. Smalldon defined antisocial as a pattern of behavior that violates the standards of society and a difficulty with empathizing with other people and seeing their perspectives. Dr. Smalldon testified that "narcissistic" means that an individual may display an outward appearance of being self-assured but when confronted, provoked, or challenged, often responds in a way that is out of proportion to any realistic feature of the provocation.
Dr. Smalldon also testified that appellant had no difficulty in determining right from wrong or what is criminal conduct and what is not. Dr. Smalldon testified that there was no direct connection between appellant's personality disorder and the commission of the offense.
The nature and circumstances of the offense in this case are entitled to absolutely no weight in mitigation. The evidence presented at trial indicates that appellant trespassed into Rutledge's farmhouse with the intent of robbing her. When appellant realized Rutledge was in the farmhouse, appellant then brutally attacked Rutledge and killed her by stabbing her repeatedly.
Appellant's history, character and background are entitled to some mitigating weight. After the death of his father when appellant was four, appellant's family deteriorated rapidly. Due to appellant's mother's inability to function as a parent, appellant, beginning at age four, lacked parental nurturing and discipline as well as positive role models. During his childhood, appellant was moved several times, including from foster homes.
The circumstances of appellant's upbringing and family life indeed present a sad story. However, we find no evidence of any extraordinary circumstances in appellant's past which would significantly mitigate appellant's culpability. Consequently, we assign only some weight to appellant's history, character and background.
Of the mitigating factors listed in R.C. 2929.04(B), we find that factors (1), (2), and (6) do not apply based upon the evidence presented. We also find that factor (3) does not apply based upon the evidence presented. While Dr. Smalldon testified that appellant had a personality disorder with antisocial and narcissistic features, Dr. Smalldon also testified that appellant had no significant brain impairment and that he was of average intelligence. Dr. Smalldon further testified that appellant knew the difference between right and wrong and had no difficulty determining what is criminal conduct and what is not. Nothing in the record indicated a connection between appellant's personality disorder and the commission of the offense.
With regard to factor (4), the record discloses that appellant was nineteen years old at the time of the offense. While considered as mitigating, appellant's youth cannot, alone, excuse the course of conduct undertaken by appellant. "Absent evidence demonstrating that it should weigh heavily in the balance, we grant it very little weight." State v. Beuke (1988), 38 Ohio St.3d 29,44-45.
We assign no weight to factor (5). The record discloses that appellant had a juvenile history of truancy, minor theft offenses, and probation violations. As an adult, appellant had two felony convictions, one for grant theft, the other one for aggravated trafficking.
With regard to factor (7), appellant adduced evidence of his alcohol and substance abuse and of his ability to adjust to prison life. We cannot say that these factors, taken either in isolation or together with the other factors offered in mitigation, weigh significantly against the aggravated circumstances of aggravated robbery and aggravated burglary. We therefore assign very little weight to this evidence. Appellant also asks us to consider any "residual doubt" of his guilt under factor (7).
Residual doubt may be a mitigating factor in a capital prosecution depending upon the strength of the evidence presented by the State during the guilt phase of the proceedings. See State v. Waton (1991), 61 Ohio St.3d 1, 17-18. We find that the evidence presented by the State convincingly demonstrates that appellant was the perpetrator of these crimes. We simply have no doubt that appellant robbed, burglarized and murdered Rutledge. Appellant's claim of residual doubt is not entitled to any mitigating weight under these circumstances. State v. Philipps (1995), 74 Ohio St.3d 72,106; State v. Kinley (1995), 72 Ohio St.3d 491, 499.
After independently weighing the aggravating circumstances against all of the evidence offered by appellant in mitigation, we find that the proved aggravating circumstances of aggravated robbery and aggravated burglary clearly outweigh the mitigating factors beyond a reasonable doubt. We therefore find that appellant's death sentence is appropriate.
 III. PROPORTIONALITY REVIEW.
R.C. 2929.05 requires us to review appellant's death sentence and determine whether it is excessive or disproportionate in relation to the sentences imposed in other similar cases within the geographical jurisdiction of this court. Steffen,31 Ohio St.3d at 124. Appellant's sentence is similar to the sentences imposed in other cases where the defendant committed a felony murder. See State v. McGuire (Apr. 15, 1996), Preble App. No. CA95-01-001, unreported; State v. Benge (Dec. 5, 1994), Butler App. No. CA93-06-116, unreported; State v. Webb (May 24, 1993), Clermont App. No. CA91-08-053, unreported; State v. Williams (Nov. 2, 1992), Butler App. Nos. CA91-04-060, CA92-06-110, unreported; State v. Lawson (June 4, 1990), Clermont App. No. CA88-05-044, unreported; State v. DePew (June 29, 1987), Butler App. No. CA85-07-075, unreported. Therefore, we find that appellant's death sentence is neither excessive nor disproportionate.
For the reasons set forth above, we affirm appellant's convictions and sentences, including his death sentence for aggravated murder. Judgment affirmed.
WALSH, P.J., and POWELL, J., concur.
[1] In the sentencing entry, the trial court also merged the aggravated burglary charged in Counts 4 and 5 with the aggravated burglary charged in Count 3, and the aggravated robbery charged in Count 7 with the aggravated robbery charged in Count 6.
[2] Because appellant's first fourteen assignments of error deal with jury instructions, this standard of review will apply to appellant's first fourteen assignments of error.
[3] Because appellant's first, second, third, fourth, fifth, seventh and fourteenth assignments of error all deal with the trial court's refusal to deliver a requested jury instruction, this standard of review will apply to all of the foregoing assignments of error.
[4] In the interest of brevity, we have omitted the subsequent case history of those Ohio decisions cited herein. Our research shows that certiorari has not been granted in any of these cases by the United States Supreme Court.
[5] Appellant asked the trial court to instruct the jury that:
 Mitigating factors are factors that, while they do not justify or excuse the crime, nevertheless in fairness, sympathy and mercy, may be considered by you, as they call for a penalty less than death, or lessen the appropriateness of a sentence of death.
The trial court rejected appellant's proposed instruction. The trial court's instructions regarding the mitigating factors can be found under appellant's third assignment of error.
[6] The language of the trial court's jury instructions can be found under appellant's third assignment of error.
[7] Because the language used by the trial court in this particular jury instruction is identical to the language of R.C.2929.04(B)(7), which in turn is commonly referred to as the "catch all" provision, this particular jury instruction will hereafter be referred to as "the trial court's use of the R.C.2929.04(B)(7) `catch all' provision."
[8] The trial court instructed the jury on reasonable doubt as follows:
 Reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based upon reason and common sense.
 Reasonable doubt is a doubt — reasonable is not mere possible doubt, because everything relating to human affairs or depending on moral courage — on moral evidence is open to some possible doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.
[9] On September 20, 1994, Jackson was arrested. He was subsequently convicted of a theft offense.
[10] R.C. 2913.02(A)(1) provides that "[n]o person, with purpose to deprive the owner of property * * *, shall knowingly obtain or exert control over * * * the property * * * without the consent of the owner or person authorized to give consent[.]"